UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ELISHA SHANIQUE BOSTON,                             :

                            Plaintiff,                 :      13cv3271 (GHW) (DF)

        -against-                                   :      **REPORT AND**
                                                        **RECOMMENDATION**
                                        :

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,             :

                         Defendant.                 :
-------------------------------------------------------------X

**TO THE HON. GREGORY H. WOODS, U.S.D.J.:**

        Plaintiff Elisha Shanique Boston, a/k/a Elisha S. Floyd[1] ("Plaintiff") seeks review of the final decision of the Acting Commissioner of Social Security ("Defendant" or the "Commissioner"), denying Plaintiff Supplemental Security Income ("SSI") on the ground that Plaintiff's claimed impairments did not constitute a disability under section 1614(a)(3)(A) of the Social Security Act.  Plaintiff has moved, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, for judgment on the pleadings reversing the decision of the Commissioner, or, in the alternative, remanding the case.  (Dkt. 23.)  Defendant has cross-moved for judgment on the pleadings affirming the Commissioner's decision.  (Dkt. 28.)

        For the reasons set forth below, I respectfully recommend (a) that Plaintiff's motion be granted, to the extent that Plaintiff requests that her claim be remanded for further consideration, and (b) that Defendant's cross-motion be denied.

---

[1] *See* Social Security Administration ("SSA") Administrative Record ("R.") (Dkt. 21), at 167 (Disability Report, listing "Elisha S Floyd" as another name that plaintiff Boston has used on her medical or educational records).

## BACKGROUND

Plaintiff filed an application for SSI on August 26, 2010[2] (*see* R. at 182), alleging disability beginning December 27, 2007 (*id.*).

The facts set forth herein are taken from the SSA Administrative Record, which includes, *inter alia,* Plaintiff's medical records and the transcript of a February 28, 2012 hearing held before Administrative Law Judge ("ALJ") Mark Hecht, at which Plaintiff testified.

### A.   Plaintiff's Personal and Employment History

Plaintiff was born on November 9, 1978, and was 31 years old at the time she filed her application. (*See id.* at 65, 138.) According to her testimony and disability report form, Plaintiff finished her senior year of high school and then obtained a general equivalency diploma. (*Id.* at 66, 169.) Plaintiff testified that she has five children. (*Id.* at 75.)

Plaintiff provided information regarding her previous employment on her work history report, as well as through subsequent testimony before the ALJ. (*Id.* at 66-68, 196.) She stated that, from 1998 to 2001, she worked at various McDonald's locations, primarily as a cashier. (*Id.* at 66-67, 196.) Plaintiff indicated that, from 2001 to 2004, she worked as a home health aide and personal health aide, and, from 2006 to 2007, she was employed as a security guard. (*Id.* at 67-68, 196.) She stated that her most recent job – which she still held in 2010, at the time she applied for SSI (*see id.* at 68, 168, 196) – consisted of working three days a week with autistic children (*id.* at 68-69). She testified that this job involved "teaching [the children] the way of

---

[2] "If certain criteria are met, a claimant may establish an application date on the date the [SSA] receives a written statement of intent to file for benefits or an oral inquiry about benefits. This process is referred to as protective filing." *Reyes v. Colvin*, No. 13cv4683, 2015 WL 337483, at *1 (S.D.N.Y. Jan. 26, 2015) (citing 20 C.F.R. § 416.345). Although Plaintiff's SSI application is itself dated September 8, 2010 (*see* R. at 138), the protective filing date for her claim was August 26, 2010 (*see id.* at 182), and the latter date has been established as her application date.

life [and] [t]aking them out into the community." (*Id.* at 69.) Plaintiff testified that she last worked in July of 2011. (*Id.* at 68.)

### B.   Medical Evidence

In the disability report that Plaintiff submitted to the SSA, Plaintiff listed a bone spur in her left foot, muscle spasms, anxiety, and depression as the conditions that limited her ability to work. (*Id.* at 168.) Plaintiff's medical records and hearing testimony also revealed plantar fasciitis[3] in her left foot, lingering effects of a fractured right ankle, and neck and back issues.[4] (*See, e.g.*, *id.* at 69-73, 257-58, 475.)

#### 1.   Records Regarding Plaintiff's Physical Impairments

##### a.   Interfaith Medical Center
##### (Dr. Charles Lawrence, December 27, 2007)

On December 27, 2007, Plaintiff was brought to the emergency room at Interfaith Medical Center ("Interfaith"), after falling and injuring her right ankle. (*Id.* at 232, 235.) Plaintiff was seen by Dr. Charles Lawrence, who diagnosed Plaintiff with a right ankle sprain. (*Id.* at 233.) Later on the same date, Plaintiff had a consultation with another doctor at Interfaith,

---

[3] Plantar fasciitis is the "inflammation of the dense fibrous band of tissue of the sole of the foot that is marked especially by heel or arch pain." http://www.merriam-webster.com/dictionary/fasciitis (last visited Feb. 5, 2015).

[4] Medical records also showed that Plaintiff had a thyroid nodule (*see* R. at 285-88, 476-77), but this was not considered as part of the ALJ's disability determination, and neither party has referenced it. In addition, Plaintiff's medical records reveal that she made a number of visits to a medical clinic with complaints of short-lasting, but chronic headaches (*see id.* at 432, 444, 464-65, 467), but an MRI of Plaintiff's brain on June 29, 2011 revealed "unremarkable" results (*id.* at 466), and, although Plaintiff's history of headaches was briefly referenced in the ALJ's decision (*see* R. at 55), it has not been raised by the parties here. During a January 2012 visit to The Roosevelt Hospital (*see infra* at n.5) to address her headaches, Plaintiff was seen by Dr. Dan Wiener, who recorded, as part of a "neuro exam," that Plaintiff's gait was "normal" (R. at 447).

3

who noted swelling in the ankle, but described Plaintiff's injury as a "right ankle sprain/strain."

(*Id.* at 234.)

## b. St. Luke's-Roosevelt Hospital[5]
### (January 1, 2008 - April 22, 2010)

On January 1, 2008, X-rays were taken of Plaintiff's right ankle, foot, and heel at

St. Luke's.  (*Id.* at 248-49, 251.)  From the X-rays, Radiology Resident Dr. Iwao Tanaka

concluded that

> [t]here [was] a fracture of the inferior aspect of the distal right
> fibula,[6] with distal displacement of the fracture fragment.  There
> [was] soft tissue swelling around the fracture at the lateral
> malleolus.[7]  The ankle mortise [was] intact.  No other fractures
> [were] identified.  There [were] no foreign bodies or abnormal
> calcifications.  There [was] a calcaneal spur.[8]

---

[5] At all times relevant to this action, the entity known as St. Luke's-Roosevelt Hospital
("St. Luke's-Roosevelt") was comprised of two facilities, sometimes referred to collectively in
Plaintiff's medical records, and sometimes referred to separately as St. Luke's Hospital
("St. Luke's") and The Roosevelt Hospital ("Roosevelt").  Although both facilities are now part
of the Mount Sinai Health System, and are currently named Mount Sinai St. Luke's and Mount
Sinai Roosevelt, *see* http://www.stlukeshospitalnyc.org/index.aspx;
http://www.roosevelthospitalnyc.org/index.aspx (both last visited Feb. 28, 2015), this Court will
identify the relevant facilities herein in the same manner as they are identified in Plaintiff's
medical records.

[6] The fibula is "the outer and usually smaller of the two bones between the knee and
ankle."  *See* http://www.merriam-webster.com/dictionary/fibula (last visited Mar. 6, 2015).

[7] The lateral malleolus is the protuberance at the lower end of the fibula.
http://www.encyclopedia.com/doc/1O62-malleolus.html (last visited Feb. 13, 2015.)

[8] A calcaneal spur is an abnormal bony outgrowth on the heel.  *See* http://medical-
dictionary.thefreedictionary.com/calcaneal+spur (last visited Mar. 6, 2015).

(*Id.* at 251.)  Dr. Tanaka also noted that there was probably "small anterior joint capsule effusion."[9]  (*Id.*)  Plaintiff was proscribed Vicodin,[10] her foot was placed in a splint, and she was instructed to use crutches.  (*Id.* at 337.)

Additional X-rays of Plaintiff's right foot and right ankle appear to have been taken on January 10, 2008.  (*Id.* at 246-47.)  These X-rays showed that "[t]here [was] a 3 mm avulsion fracture at the inferior aspect of the lateral malleolus," although "[t]he visualized joint spaces appear[ed] well maintained."  (*Id.*)  An Orthopedic Clinic report from St. Luke's-Roosevelt, made on the same date, indicates that Plaintiff was instructed to place weight on her right foot as tolerated,[11] with the use of a cane, and to return to the clinic in two weeks.  (*Id.* at 346.)

Plaintiff returned to the Orthopedic Clinic on January 24, 2008.  (*Id.* at 345.)  The progress report reflects that Plaintiff had been using a cane and bearing weight on her right foot as tolerated.  (*Id.*)  The notes further indicate that Plaintiff reported that her pain and swelling was improving, but that the area over her lateral malleolus was tender to palpation.  (*Id.*)  Plaintiff was directed to attend physical therapy for ankle strengthening and to return to the clinic in six weeks.  (*Id.*)

Plaintiff returned to the Orthopedic Clinic on March 6, 2008, and was referred to the Foot Clinic (*id.* at 335), which she visited on March 12, 2008 (*id.* at 334).  On April 17, 2008, she again returned to the Orthopedic Clinic.  (*Id.* at 333.)  The progress report from that date

---

[9] Joint effusion means increased fluid in a cavity of a joint.  *See* http://www.medilexicon.com/medicaldictionary.php?t=28079. (last visited Mar. 6, 2015).

[10] Vicodin, a brand name for hydrocodone, can be used "to relieve moderate-to-severe pain."  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html (last visited Mar. 6, 2015).

[11] The notation in the medical records is "WBAT," which means "weight bearing as tolerated."

indicates that Plaintiff had completed four months of physical therapy, was able to tolerate walking and weight bearing with a splint, and was not experiencing any numbness or tingling. (*Id.*)  Plaintiff did, however, have significant swelling in the lateral malleolus and felt pain from the doctor's palpation of the area.  (*Id.*)  The doctor reported that Plaintiff's strength in her right lower extremity was four out of five, and that, in her left lower extremity, her strength was five out of five.  (*Id.*)  The report recommended continued physical therapy at home.  (*Id.*)

On June 20, 2008, Plaintiff went to Roosevelt because of left knee pain.  (*Id*. at 330.) Records suggest that Plaintiff had injured her knee three days earlier by twisting it.  (*See id*.; *see also id.* at 332.)  Plaintiff indicated that the knee felt like it had "popped" out of place.  (*Id.* at 330.)  She reported, though, that she had been walking since the date of the injury.  (*Id.*)  X-rays of Plaintiff's left knee were taken, and the findings appeared to be normal.  (*Id.* at 245.) Specifically, the report stated that there was "no plain film evidence of fracture, dislocation, or bony destruction," that there was "no effusion," that "[t]he joint space [was] well maintained," that "[n]o radiopaque foreign body [was] identified," and that "no abnormal calcification [was] seen."  (*Id.*)  Plaintiff was diagnosed with a left knee sprain and proscribed Ibuprofen.  (*Id.* at 326, 332.)

On July 17, 2008, Plaintiff returned to the Orthopedic Clinic, complaining of left knee pain, and had both her left knee and right ankle examined.  (*Id.* at 325.)  The report indicates that Plaintiff's right ankle was not tender to palpation at the lateral malleolus and that Plaintiff did not have right ankle instability.  (*Id.*)  Regarding Plaintiff's left knee, the report reflects that it was not tender to palpation and that there were no anterior or posterior drawer signs[12] nor a positive

---

[12] A drawer sign is, "in a knee examination, the forward or backward sliding of the tibia under applied stress, which indicates laxity or tear of the anterior (forward slide) or posterior

McMurray sign.[13]  (*Id.*)  Plaintiff was instructed to do physical therapy and to return to the clinic in six to eight weeks.  (*Id.*)  The report also indicates that an MRI of the left knee would be ordered if pain persisted after Plaintiff completed physical therapy.  (*Id.*)

Plaintiff returned to the Orthopedic Clinic on October 23, 2008.  (*Id.* at 324.)  The clinic report from this date reflects that Plaintiff had experienced "slight improvement" since doing physical therapy.  (*Id.*)  The report noted a number of findings regarding Plaintiff's left knee, including that Plaintiff was tender to palpation and had a positive McMurray sign.  (*Id.*)  An MRI of Plaintiff's left knee was ordered[14] and Plaintiff was directed to physical therapy for what was described as patellar tendonitis in her left knee and plantar fasciitis in her left foot.[15]  (*Id.*)  Plaintiff again visited the Orthopedic Clinic on December 4, 2008.  (*Id.* at 485.)  The report of this visit states that Plaintiff likely had plantar fasciitis, and that she was instructed to add stretches to her existing physical therapy and encouraged to lose weight.  (*Id*.)

On January 7, 2009, Plaintiff returned to the Emergency Department at St. Luke's-Roosevelt, with a chief complaint of pain in her left heel.  (*Id.* at 413, 419.)  The attending physician listed a primary diagnosis of plantar fasciitis and noted that Plaintiff walked with a cane, but ambulated without difficulty.  (*Id.* at 419, 421.)  The physician recorded Plaintiff's

---

(backward slide) cruciate ligament of the knee."  *See* http://medical-dictionary.thefreedictionary.com/Drawer+test (last visited Feb. 15, 2015).

[13] Determining a patient's "McMurray sign" involves administering a "McMurray test," which is "a test for injury to meniscal structures of the knee in which the lower leg is rotated while the leg is extended; pain and a cracking in the knee indicates meniscal injury."  *See* http://medical-dictionary.thefreedictionary.com/McMurray+test (last visited Feb. 15, 2015).

[14] An Orthopedic Clinic report from January 22, 2009 states that an MRI of Plaintiff's left knee was negative for a meniscus tear.  (*See* R. at 483.)

[15] At the administrative hearing, Plaintiff explained that she developed pain in her left foot as a result of placing added weight on that side, after having had her right foot placed in a cast.  (*See* R. at 71; *see also infra* at Background Section (C)(2).)

history of pain in the heel, which Plaintiff described as having had a gradual onset, but as progressively worsening and having caused constant pain for one year.  (*Id.* at 419.)  The physician stated that Plaintiff could "return to work with restrictions" and directed Plaintiff to continue to use a cane as needed.  (*Id.* at 422.)  Plaintiff was prescribed Ibuprofen and Vicodin. (*Id.* at 413.)

On May 21, 2009, X-rays were taken of Plaintiff's left foot and left heel.  (*Id.* at 243-44.) The X-ray reports both indicate that there were no signs of "acute fracture or dislocation, "significant degenerative changes," or "significant soft tissue swelling," but that there was "enthesopathy[16] at the quadriceps tendon insertion," and "[a] small plantar calcaneal spur."  (*Id.* at 243, 244.)

Plaintiff was seen by Dr. Tommy Wong at Roosevelt on January 15, 2010, with a chief complaint of a backache.  (*Id.* at 429.)  The physician's notes reflect that Plaintiff's pain was located in her bilateral upper back, that the pain did not radiate, and that it was "mild" in intensity level.  (*Id.*)  Dr. Wong prescribed Plaintiff Ibuprofen.  (*Id.* at 431.)

On April 22, 2010, Plaintiff had X-rays taken of her cervical spine and thoracic spine. (*Id.* at 241-42.)  The X-ray of Plaintiff's cervical spine revealed no abnormalities other than slight straightening of the cervical spine, which could have been "secondary to [Plaintiff's] positioning" at the time the X-ray was taken.  (*Id.* at 242.)  The X-ray of Plaintiff's thoracic spine showed multiple anterior osteophytes[17] in Plaintiff's midthoracic spine.  (*Id.* at 241.)

---

[16] Enthesopathy is "a disease occurring at the sight of attachment of muscle tendons and ligaments to bones or joint capsules."  http://medical-dictionary.thefreedictionary.com/enthesopathy (last visited Feb. 13, 2015).

[17] Ostephytes, also known as bone spurs, are "bony projections that develop along the edges of bones."  http://www.mayoclinic.org/diseases-conditions/bone-spurs/basics/definition/con-20024478 (last visited Mar. 6, 2015).

c.     **Internal Medicine Consultative Examination**
**(Dr. Marilee Mescon, November 3, 2010)**

On November 3, 2010, Dr. Marilee Mescon, to whom Plaintiff was referred by the SSA

Division of Disability Determination, conducted a consultative, internal medicine examination of

Plaintiff regarding her chief complaints of back, foot, and leg pain.  (*See generally id.* at 257-60.)

Plaintiff reported excruciating pain in her left ankle when getting out of bed in the morning.  (*Id.*

at 257.)  She informed Dr. Mescon that she slept with a splint on her left ankle, that cortisone

shots in the ankle had not relieved her pain, and that she had been told that she might need

surgery.  (*Id.*)  Plaintiff also reported pain in her right ankle, on a 10-point scale, of four out

of 10, without medication, and two out of 10, with medication.  (*Id.*)  Plaintiff further reported

back pain that she rated a 10 out of 10, without medication, and four out of 10, with medication.

(*Id.* at 257-58.)  Plaintiff told Dr. Mescon that she had undergone an MRI that had shown muscle

spasms in her back.  (*Id.* at 257.)

Dr. Mescon reported that Plaintiff's medications were Lexapro,[18] Oxycodone[19] and

Naproxen.[20]  (*Id.* at 258.)  According to Dr. Mescon's report, Plaintiff was able to "cook, clean,

shop, do the laundry, take care of her children[,] . . . shower, bathe, and dress without

---

[18] Lexapro is a brand name for the drug escitalopram and is used to treat depression and generalized anxiety disorder.  *See* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603005.html#why (last visited Feb. 26, 2015).

[19] Oxycodone is used to relieve moderate to severe pain.  *See* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682132.html#why (last visited Feb. 26, 2015).

[20] "Prescription naproxen is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis (arthritis caused by a breakdown of the lining of the joints), rheumatoid arthritis (arthritis caused by swelling of the lining of the joints), juvenile arthritis (a form of joint disease in children), and ankylosing spondylitis (arthritis that mainly affects the spine)." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html#why (last visited Feb. 26, 2015).

assistance." (*Id.*) Dr. Mescon noted that Plaintiff was in "no acute distress," had a "normal gait, station, and stance," and could "squat completely." (*Id.*) Dr. Mescon observed that Plaintiff had difficulty walking on her heels and toes and that she used a cane, which was helpful to alleviate her pain but was not medically necessary. (*Id.* at 258-59.) She also noted that Plaintiff needed no help changing for the examination, getting on and off the exam table, or going from a seated to a standing position. (*Id.* at 259.)

Dr. Mescon found that Plaintiff's cervical spine and lumbar spine "show[ed] full flexion [and] extension." (*Id.*) Dr. Mescon also reported that Plaintiff had a full range of motion in her knees and ankles bilaterally, and that there was no redness or swelling. (*Id.*) After the examination, Dr. Mescon recorded diagnoses of "back pain," "history of left plantar fasciitis," and "history of right ankle fracture." (*Id.* at 260.)

Dr. Mescon's prognosis for Plaintiff's condition was "fair." (*Id.*) In a "Medical Source Statement" that she provided with respect to her examination of Plaintiff, Dr. Mescon opined that "there [were] no limitations in [Plaintiff's] ability to sit, but her capacity to stand for long periods of time, climb, push, pull, or carry heavy objects would probably be moderately limited because of ankle and heel pain." (*Id.*)

### d.  Physical RFC Assessment
### (Dr. S. Marinaro,  January 5, 2011)

On January 5, 2011, Dr. S. Marinaro conducted a Physical Residual Functional Capacity ("RFC") Assessment of Plaintiff. (*See generally id.* at 279-84.) Dr. Marinaro concluded that Plaintiff did not have any postural, manipulative, visual, communicative, or environmental limitations. (*Id.* at 281-82.) Dr. Marinaro did conclude, however, that Plaintiff had certain exertional limitations. (*See id.* at 280.) In particular, Dr. Marinaro indicated that Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry less than 10 pounds; stand

and/or walk (with normal breaks) for a total of less than two hours in an eight-hour work day; and sit (with normal breaks) for a total of about six hours in an eight-hour work day. (*Id*.) In addition, Dr. Marinaro indicated that Plaintiff had a limited ability to push and/or pull in her lower extremities. (*Id.*)

Dr. Marinaro based his findings on a review of Plaintiff's medical records and personal reports regarding her impairments. He specifically noted: (1) Plaintiff's reported level of pain of four out of 10, without medications, and two out of 10, with medications; (2) Dr. Mescon's examination report that Plaintiff's gait and station were normal, that she was able to squat fully, that her use of a cane was not medically necessary, that her musculoskeletal exam was normal, and that all of her joints had full range of motion; (3) the results of Plaintiff's various X-rays; and (4) Plaintiff's ability to engage in activities of daily living, including her ability to cook, clean, shop, do laundry, care for her children, walk, use public transportation, watch television, and go to the movies. (*See id.* at 280-81.) Dr. Marinaro concluded that Plaintiff's statement that she could "not walk or stand for long periods of time" was "partially supported by [the] objective [Medical Evidence of Record] and [was] partially credible." (*Id*. at 283.) Dr. Marinaro opined, however, that Plaintiff's "allegations of pain [were] supported . . . to a lesser extent than alleged." (*Id.*)

### e.    St. Luke's-Roosevelt
### (May 11, 2011- July 13, 2011)

After the above-referenced consultative evaluations, Plaintiff continued to seek treatment at St-Luke's-Roosevelt. (*See generally id.* at 286-94.) On May 11, 2011, Plaintiff was seen by Neurologist Dr. Migdana Kepecs. (*Id.* at 289.) Dr. Kepecs noted that Plaintiff reported having had neck and mid-back pain since 2007, and indicated that Plaintiff was experiencing

paresthesia[21] in her right upper extremity.  (*Id.* at 291, 474-75.)  Dr. Kepecs ordered MRIs of

Plaintiff's cervical spine and thoracic spine.  (*Id.* at 291.)  Records also indicate that Plaintiff had

appointments in the hospital's Orthopedic Clinic on May 12, 2011 and May 19, 2011.  (*Id.*

at 292-93, 473.)  At the May 12 appointment, the doctor noted that Plaintiff was complaining of

plantar fasciitis and referred Plaintiff to a Foot and Ankle Clinic.  (*Id.* at 473.)  A MRI of

Plaintiff's thoracic spine on May 21, 2011 showed "a mild disc bulge"[22] at T8/9[23] and "minimal

thoracic degenerative findings."  (*Id.* at 469.)  A MRI of Plaintiff's cervical spine on the same

date showed "a mild disc bulge at C6-C7,[24] without spinal stenosis[25] or spinal cord

compression[,] [and an] [o]therwise unremarkable MRI examination of the cervical spine."  (*Id.*

at 471.)

---

[21] "A sensation of pricking, tingling, or creeping on the skin that has no objective cause."
http://www.merriam-webster.com/dictionary/paresthesia (last visited Feb. 13, 2015).

[22] "Disks act as cushions between the vertebrae in [the] spine" and "[a] bulging disk
extends outside the space it should normally occupy."  http://www.mayoclinic.org/diseases-
conditions/herniated-disk/expert-answers/bulging-disk/FAQ-20058428 (last visited Feb. 26,
2015).

[23] "T" refers to "thoracic," which is one portion of the spinal column, and the numbers
"8/9" refer to specific vertebrae within the thoracic region.  *See*
http://www.nlm.nih.gov/medlineplus/ency/imagepages/1774.htm (last visited Mar. 6, 2015)

[24] "C6-C7" refers to the sixth and seventh vertebrae in the cervical spine, which are
located at the bottom of the neck region.  *See*
http://www.nlm.nih.gov/medlineplus/ency/imagepages/1772.htm (last visited Mar. 6, 2015).

[25] "Spinal stenosis is a narrowing of the open spaces within your spine, which can put
pressure on your spinal cord and the nerves that travel through the spine."  *See*
http://www.mayoclinic.org/diseases-conditions/spinal-stenosis/basics/definition/con-20036105
(last visited Mar. 6, 2015).

Plaintiff returned to the Neurology clinic on June 15, 2011 with complaints of mid-back and neck pain.  (*Id*. at 467.)   The attending physician (likely Dr. Kepecs)[26] reported the findings of the May 12, 2011 MRI and noted that there were "minimal thoracic degenerative findings," but possible diverticulosis[27] of the cervical spine, as well as a disc bulge without spinal stenosis or cord compression.  (*Id*.)  Although the Record is not clear as to when Plaintiff was first prescribed Neurontin,[28] the doctor at this visit indicated that her prescription for this medication was to be increased, as it was "somewhat helpful."  (*Id.*)  The doctor also ordered that an MRI be taken of Plaintiff's brain, to rule out a possible structural lesion as a cause of Plaintiff's reported headaches.  (*Id*.)  As noted above (*see supra* at n.4), the MRI of Plaintiff's brain was taken on June 29, 2011, and the results were "unremarkable" (*id*. at 466).

Plaintiff was seen at the Neurology clinic again on July 13, 2011 with complaints of mid-back and neck pain.  (*Id*. at 465.)  The notes indicate that Plaintiff was alternating her Neurontin with medications that she took for mental her impairment because "she was told they don't mix"; the doctor advised her "not to alternate Neurontin [and] psych meds."  (*Id*.)

---

[26] The signature on this record appears to be the same as a previous signature from Dr. Kepecs.  (*Compare* R. at 467 *with id*. at 291.)

[27] Diverticulum is "a circumscribed pouch or sac occurring normally or created by herniation of the lining mucous membrane through a defect in the muscular coat of a tubular organ."  http://medical-dictionary.thefreedictionary.com/diverticulum (last visited, March 6, 2015).

[28] Neurontin (also known by the generic name Gabapentin) is used "to help control certain types of seizures in people who have epilepsy . . . and [is] also used to relieve the pain of postherpetic neuralgia ( . . . the burning, stabbing pain or aches that may last for months or years after an attack of shingles)."  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html (last visited Feb. 27, 2015); *see also* http://www.pfizer.com/products/product-detail/neurontin.

### f.   Records from Treating Podiatrist
### (Dr. Brian Quinn, July 24, 2009 - February 13, 2012)

Plaintiff began seeing podiatrist Dr. Brian Quinn in July 2009 (*id*. at 486), and records

indicate that she made several visits to him between July 24, 2009 and February 15, 2012 (*id.*

at 493-96).[29]

On December 8, 2011, at Roosevelt, Dr. Quinn performed a partial fasciectomy[30] and

radiofrequency ablation[31] on Plaintiff's left foot.  (*Id.* at 351, 450-62.)  Following the procedure,

Dr. Quinn noted that "[Plaintiff] tolerated the procedure well and was discharged to recovery in

good condition, where she was placed in a surgical shoe with instructions to partially bear weight

with the use of crutches."  (*Id.* at 351, 450.)

On February 13, 2012, Dr. Quinn completed a Physical RFC Questionnaire for Plaintiff.

(*See id.* at 486-90.)  In the questionnaire, Dr. Quinn noted that Plaintiff was still "recovering

from heel spur (fasciitis) surgery."  (*Id.* at 486.)  He listed Plaintiff's symptoms as pain in

palpation, indicating plantar fascia, and left foot pain when Plaintiff stood without wearing a

walking cast.  (*Id.*)  He specified that Plaintiff experienced pain daily, particularly in the morning

and after sitting, and that activity also caused Plaintiff to feel pain.  (*Id.*)  Where asked to record

his "clinical findings and objective signs," Dr. Quinn identified "pain [and] swelling in

_____

[29] It appears from the Record that Plaintiff visited Seaport Podiatry, where Dr. Quinn worked, 14 times between July 24, 2009 and February 15, 2012.  (*See* R. at 493-96.)  While Defendant argues that Dr. Quinn personally treated Plaintiff only once in 2010 and twice in 2011 (*see* Def. Mem. at 8), the basis of that argument is not clear to this Court, as the notes are largely vague and illegible.

[30] A fasciectomy is the "surgical excision of strips of fascia."  http://www.merriam-webster.com/medical/fasciectomy (last visited Feb. 26, 2015).  Fascia is "a sheet of connective tissue covering or binding together body structures."  http://www.merriam-webster.com/dictionary/fascia (last visited Feb. 26, 2015).

[31] Radiofrequency ablation involves "[t]he use of electrodes to generate heat and destroy abnormal tissue."  http://www.medicinenet.com/script/main/art.asp?articlekey=31743 (last visited Feb. 26, 2015).

[Plaintiff's] left heel." (*Id.*)  He listed Plaintiff's treatments as pain medication, steroid injections, orthotics, and partial fasciectomy surgery. (*Id.*)

Dr. Quinn further indicated that Plaintiff had pain when standing and walking, and that she could walk only one city block without rest or severe pain. (*Id.* at 487.)  He indicated that Plaintiff could stand for 15 minutes at a time (*id.*), could sit for four hours in an eight-hour work day, and could stand and/or walk for less than two hours over the course of an eight-hour work day (*id.* at 487-88).  Dr. Quinn opined that "[Plaintiff] should avoid work that involves standing or sitting for prolonged times." (*Id.* at 489.)  He also specified that, during an eight-hour work day, Plaintiff would need to walk for five minutes, approximately every hour; that Plaintiff could "rarely" lift or carry less than 10 pounds; and that Plaintiff could "rarely" twist, bend, crouch, or climb stairs or ladders. (*Id.* at 488-89.)  He estimated that Plaintiff was likely to be absent from work as a result of impairments or treatment more than four days per month. (*Id.* at 489.)

### g.    Harlem Hospital Center Visit
### (July 26, 2011)

Plaintiff visited the Emergency Department at Harlem Hospital Center ("Harlem Hospital") on July 26, 2011 with chief complaints of chronic left foot pain and a rash on her face and abdomen. (*See generally id.* at 361-67.)  The attending physician, Dr. Lara DeNonno, noted plantar fasciitis, heat rash, and contact dermatitis. (*Id.* at 363.)  Plaintiff was prescribed medicine for her rash, as well as Ibuprofen, and was encouraged to follow up with her primary medical doctor or podiatrist. (*Id.* at 363, 366.)

### 2.  Records Regarding Plaintiff's Mental Impairment

#### a.  St. Luke's, Psychiatric Evaluation
#### (Dr. Andrew Anson, August 10, 2010)

On August 8, 2010, Plaintiff underwent a psychiatric evaluation by Dr. Andrew Anson at

St. Luke's.  (*See id.* at 238-39.)  She had been referred for the psychiatric evaluation by the

medical emergency room staff at St. Luke's, where she had been seen, a month earlier, for ankle

and back pain.  (*Id.* at 238.)  Plaintiff reported to Dr. Anson that she had only undergone one

prior psychiatric evaluation, which had been in 2008, in connection with an application for

public assistance.  (*Id.*)  She stated that, at the time, she had been informed that she had mild

depression, although Dr. Anson noted in his report that, according to the "paperwork," she had

previously been assessed with an "adjustment disorder with depressed mood."  (*Id.*)

Dr. Anson's report reflected that Plaintiff reported depression for the prior year and a

half, with symptoms of "crying, poor concentration, low energy, loss of interest in her work,

poor sleep (approx[imately] [four] hours), and decreased appetite."  (*Id.*)  Dr. Anson noted that

Plaintiff did not have marked psychomotor retardation, that she was able to get out of bed to care

for her children and go to work, and that she reported an ability to concentrate at work.  (*Id.*)

Using the multiaxial method of assessment,[32] Dr. Anson diagnosed Plaintiff with the

following:  (1) Axis I – Adjustment disorder with depressed mood; (2) Axis II – Personality

---

[32] The multiaxial system of assessment "involves an assessment on several axes, each of which refers to a different domain of information."  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 27 (4th ed. rev. 2000) ("DSM-IV"). Axis I refers to clinical disorders and other conditions that may be the focus of clinical attention; Axis II refers to personality disorders and mental retardation; Axis III refers to general medical conditions that may be relevant to the understanding or management of the individual's mental disorder; Axis IV refers to psychosocial and environmental problems that may affect the diagnosis, treatment, and prognosis of mental disorders; and Axis V refers to Global Assessment of Functioning ("GAF").  *Id.*

disorder not otherwise specified with cluster B traits;[33] (3) Axis III – chronic pain; (4) Axis IV – financial, occupational, and family stress; (5) Axis V – a GAF of 55.[34]  (R. at 239.)  Plaintiff was prescribed Lexapro, given a medication information sheet, and directed to follow up in two weeks.  (*Id.*)  A plan for Plaintiff to follow up monthly for psychopharmacological management was also recorded.  (*Id.*)

### b.   Psychiatric Consultative Evaluation (Dr. Haruyo Fujiwaki, November 3, 2010)

On November 3, 2010, Dr. Haruyo Fujiwaki conducted a consultative psychiatric evaluation of Plaintiff.  (*See generally id.* at 253-56.)  Plaintiff told Dr. Fujiwaki that she was depressed and had experienced depression since she was a teenager.  (*Id.* at 253.)  According to Dr. Fujiaki's report, Plaintiff had symptoms that included "loss of usual interest, irritability, loss of energy, and concentration difficulties."  (*Id.*)  Plaintiff also described intermittent symptoms of nervousness, sweating, and hearing voices call her name.  (*Id.*)  Dr. Fujiwaki reported that Plaintiff appeared cooperative, and that her "manner of relating, social skills and overall presentation were adequate."  (*Id.* at 254.)  Dr. Fujiwaki also indicated that Plaintiff appeared goal oriented and coherent, and that her attention, concentration, recent memory skills, and remote memory skills were all intact.  (*Id.*)  Plaintiff's intellectual functioning was reported to be

---

[33] "Cluster B personality disorders are characterized by dramatic, overly emotional or unpredictable thinking or behavior."  http://www.mayoclinic.org/diseases-conditions/personality-disorders/basics/symptoms/con-20030111 (last visited Feb. 27, 2015).

[34] The GAF scale, a scale from 0 to 100, was previously used by clinicians to report their judgment of an individual's overall level of functioning.  DSM-IV at 32-34.  A GAF score in the 51-60 range was understood to signify "moderate symptoms or moderate difficulty in social, occupational, or school situations."  *Petrie v. Astrue*, 412 F. App'x 401, 506 n.2 (2d Cir. 2011) (citing DSM-IV at 376-77).  The most recent (2013) addition of the manual, however, "has dropped the use of the [GAF] scale."  *Restuccia v. Colvin*, No. 13cv3294 (RMB), 2014 WL 4739318, at *8 (Sept. 22, 2014) (quoting *Mainella v. Colvin*, No. 13cv2453, 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014)).

"average," and her "[g]eneral fund of information" was recorded as "appropriate to experience." (*Id.* at 255.)

As to Plaintiff's activities of daily living, Dr. Fujiwaki recorded that Plaintiff was able to dress, bathe, groom herself, cook, prepare food, clean, launder, and shop for food.  (*Id.*)  Plaintiff told Dr. Fujiwaki that she was able to manage money, and that "[s]he spen[t] her days working part time and talking to her children."  (*Id.*)  She indicated that she did not drive, but was able to take public transportation by herself.  (*Id.*)

In her medical source statement, Dr. Fujiwaki opined as follows:

> Vocationally, [Plaintiff] is able to follow and understand simple directions and instructions.  She can perform simple tasks independently.  She can maintain attention and concentration.  She is able to maintain a regular schedule as evidenced by her regularly working part time.  She can learn new tasks.  She can perform complex tasks independently.  She can make appropriate decisions. She may have some difficulty relating with others and dealing with stress appropriately.

(*Id.*)

Dr. Fujiwaki diagnosed Plaintiff, on Axis I, with depressive disorder, not otherwise specified, and with anxiety disorder, not otherwise specified, and, on Axis III, with back pain and pain in legs and feet.  (*Id.*)  Dr. Fujiwaki gave Plaintiff a prognosis of "fair" and recommended that Plaintiff "continue with psychological and psychiatric treatment as currently provided."  (*Id.* at 256.)

### c.     Mental RFC Assessment and "Psychiatric Review Technique" (Dr. R. Altmansberger, January 5, 2011)

On January 5, 2011, state agency psychiatrist Dr. R. Altmansberger assessed Plaintiff's mental capacities and filled out a form, opining on her mental RFC.  (*See generally id.* at 275-78.)  On this form, Dr. Altmansberger indicated that Plaintiff was "not significantly

limited" in each of the categories listed on the form in the "understanding and memory" section. (*Id.* at 275.)  Under "sustained concentration and persistence," Dr. Almansberger concluded that Plaintiff was "not significantly limited" in most of the listed categories, but that she was "moderately limited" in her ability to "maintain attention and concentration for extended periods"; to "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances"; and to "work in coordination with or proximity to others without being distracted by them."  (*Id.* at 275-76.)  In the "social interaction" and "adaptation" sections, Dr. Altmansberger found Plaintiff to be "not significantly limited" in most areas, with two exceptions – Plaintiff was found to be moderately limited in her ability to "accept instructions and respond appropriately to criticism from supervisors" and to "respond appropriately to changes in the work setting."  (*Id.* at 276.)

Dr. Altmansberger reviewed Plaintiff's medical records and noted that that Plaintiff had arrived at her examination with Dr. Fujiwaki alone via public transportation.  (*Id.* at 277.)  He also stated that she had a GED and worked part time.  (*Id.*)  He noted that she worked four days per week (12 hours total), had never been hospitalized for psychiatric reasons, and had reportedly been seeing a psychiatrist since August 2010.  (*Id.*)  He observed that her thought was normal and her memory was intact.  Dr. Altmansberger concluded that "[Plaintiff] [was] capable of understanding, remembering, and carrying out simple instructions, making simple work-related decisions, responding appropriately to supervision and co-workers, and dealing with changes in a work setting."  (*Id.*)

On the same date, Dr. Altmansberger completed a "Psychiatric Review Technique form," specifically evaluating Plaintiff's mental condition under the Listings for Affective Disorders (Listing 12.04) and Anxiety-Related Disorders (Listing 12.06).  (*Id.* at 261.)  Dr. Altmansberger

indicated that Plaintiff had depressive disorder not otherwise specified, which was a "medically determinable impairment . . . that [did] not precisely satisfy the diagnostic criteria [for Affective Disorders]." (*Id.* at 264.)  Similarly, Dr. Altmansberger found that Plaintiff had anxiety disorder not otherwise specified, which was a "medically determinable impairment . . . that [did] not precisely satisfy the diagnostic criteria [for Anxiety Related Disorders]." (*Id.* at 266.)

Dr. Altmansberger evaluated Plaintiff's degree of functional limitations and found Plaintiff had a "mild" restriction in her activities of daily living; "moderate" difficulties in maintaining social functioning; and "moderate" difficulties in maintaining concentration, persistence, or pace. (*Id.* at 271.)  He determined that Plaintiff had "never" experienced episodes of deterioration of extended duration. (*Id.*)  Dr. Altmansberger also found that the evidence did not establish the presence of "C" criteria for affective disorder.[35] (*Id.* at 272.)

---

[35] A claimant meets the listing for affective disorder (*i.e.*, Listing 12.04), where he or she meets both the "paragraph A" and "paragraph B" criteria, or meets the "paragraph C" criteria.
    To meet the "paragraph A" criteria, a claimant would need to demonstrate "medically documented persistence," of either "depressive syndrome" (characterized by at least four of nine listed symptoms including, for example, sleep disturbance, decreased energy, thoughts of suicide, and hallucinations), "manic syndrome" (characterized by at least three of eight listed symptoms, including, for example, hyperactivity, flight of ideas, and easy distractibility), or "bipolar syndrome" (manifested by the "full symptomatic picture" of both manic and depressive syndromes).
    To meet the "paragraph B" criteria, a claimant would need to demonstrate at least two of the following:  (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of extended duration.
    To meet the "paragraph C" criteria, a claimant would need to demonstrate (1) a medically documented history of chronic affective disorder of at least two years' duration causing more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and (2) one of the following:  (a) repeated episodes of decompensation, each of extended duration; or (b) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or a change in the environment would be predicted to cause the individual to decompensate; or (3) current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

### d. __Harlem Hospital Outpatient Clinic__
### (March 15, 2011 – February 6, 2012)

Plaintiff visited the Harlem Hospital Outpatient Clinic on March 15, 2011 and was seen

by Dr. Deepika Singh.  (*Id.* at 352.)  Notes from this visit reflect that Plaintiff went to the Clinic

because she did not want to continue treatment at St. Luke's-Roosevelt.  (*Id.*)  Dr. Singh noted

that Plaintiff "fe[lt] stressed out and depressed," had a "low" mood, and sometimes heard voices.

(*Id.*)  As Plaintiff told Dr. Singh that she did not want to continue taking Lexapro because it

made her feel "weird," Dr. Singh prescribed her Zoloft.[36]   (*Id.*)

Plaintiff visited the Clinic again on June 13, 2011, for a follow-up visit, and was seen by

Dr. Idowu Jolayemi.  (*Id.* at 353.)  Her chief complaint was that she "need[ed] someone to talk

to."  (*Id.*)  Plaintiff stated that her symptoms had started after she lost her mother in the past year,

as well as her grandmother.  (*Id.*)  Dr. Jolayemi noted that, as a result of this, Plaintiff had been

experiencing a "depressed mood," as well as a low energy level and poor sleep, appetite,

concentration, and memory.  (*Id.*)  Plaintiff reported that her depressive episodes usually lasted

from two to three weeks and "resolve[d] on medications," but that she had recently been

depressed for three months in a row, with no improvement.  (*Id.*)  She also told Dr. Jolayemi that

her "ability to work had been very compromised" and that she was "not . . . as productive as [she]

was] before."  (*Id.*)

Dr. Jolayemi reported that Plainitff's attitude was calm and cooperative, her mood was

"ok" but depressed at times, her thought process was logical and goal-directed, and her memory

was intact.  (*Id.* at 355.)  Plaintiff's insight, judgment, impulse control, and fund of knowledge

were all reported to be "good."  (*Id.*)  Dr. Jolayemi diagnosed Plaintiff with depression, not

---

[36] Sertraline, also known by the brand name "Zoloft," is an antidepressant medication that
is approved to treat a number of disorders, including depression.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697048.html (last visited Mar. 6, 2015).

otherwise specified, and with a differential diagnosis of pathological bereavement on Axis I.
(*Id.*)  Dr. Jolayemi noted, on Axis III, that Plaintiff had apparent good health, and, on Axis IV,
that Plaintiff had lost her mother.  (*Id.*)  On Axis V, Dr. Jolayemi assigned Plaintiff a GAF score
of 55.  (*Id.*)

On June 28, 2011, Dr. Jolayemi wrote a letter confirming that Plaintiff was a patient at
the Harlem Hospital Center Outpatient Clinic, and that she had attended a clinic appointment on
the day the letter was written.  (*Id.* at 295.)  The letter explained that Plaintiff had been
prescribed medications and was scheduled for follow up in two weeks.  (*Id.*)  The letter
concluded by stating that Plaintiff should "limit the number of environmental stressors that could
lead to decompensation in her condition, while she recovers."  (*Id.*)  Dr. Jolayemi indicated that
this included taking time off from work during the recovery period, and that Plaintiff's treatment
would likely "take effect" within one to six months.  (*Id.*)  It appears that, below Dr. Joyalemi's
signature, Plaintiff wrote in the medications that she was then taking, including Gabapentin,
Buspirone,[37] Venlaxafine,[38] and Abilify.[39]  (*Id.*)

Plaintiff was seen by Dr. Narur Rahman for a follow up visit on July 15, 2011.  (*Id.*
at 299.)  At Plaintiff's request, Dr. Rahman altered her dosages of medication, due to reported
symptoms of dizziness.  (*Id.*)  Dr. Rahman observed Plaintiff to be "calm and cooperative with

---

[37] "Buspirone, often referred to by its brand name BuSpar, is "used to treat anxiety
disorders or in the short-term treatment of symptoms of anxiety."  *See*
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a688005.html (last visited Mar. 6, 2015).

[38] "Venlafaxine, often referred to by its brand name Effexor, is used to treat depression.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694020.html#why (last visited Mar. 6,
2015).

[39] Abilify is the brand name for "Aripiprazole," a drug used to treat the symptoms of
schizophrenia.  It can also be "used with an antidepressant to treat depression when symptoms
cannot be controlled by the antidepressant alone."  *See*
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603012.html (last visited Mar. 6, 2015).

clear and coherent speech[,] and logical and goal[-]directed thought process." (*Id*.)  Dr. Rahman further indicated that Plaintiff was "anxious and mildly depressed[,] but neither psychotic nor suicidal or homicidal," and that "[h]er insight, judgment, and reality testing [were] intact."  (*Id.*)

On August 3, 2011, Dr. Kairav Shah wrote a letter similar to Dr. Joyalemi's June 28 letter, confirming that Plaintiff was a patient at the Harlem Hospital Outpatient Clinic.  (*Id.* at 296.)  Dr. Shah explained that Plaintiff was being treated for symptoms of "Major Depressive Disorder, recurrent" and had been prescribed Venlafaxine and Buspirone.  (*Id.*)  He stated that Plaintiff was "exhibiting decreased interest, poor concentration, and low energy," and that, as a result, Plaintiff should "limit [her] environmental stressors and demands" during recovery.  (*Id.*)  Dr. Shah estimated that Plaintiff's recovery would take from three to six months.  (*Id.*)

Plaintiff was seen by Dr. Singh for a follow-up visit on August 3, 2011.  (*See id.* at 301-02.)  The report of that visit reflects that Plaintiff did not report side effects from her medications and reportedly slept well, had an "ok" appetite, and maintained her routine activities with interest.  (*Id.* at 301.)  Plaintiff denied any manic, psychotic, or depressive symptoms, and stated that she was feeling better with the recent medication adjustment.  (*Id*.)  Dr. Singh reported that Plaintiff's mood was "ok," but depressed at times, and that her thought process was logical and goal-directed.  (*Id*.)  Dr. Singh diagnosed Plaintiff with the following:  Axis I – Depressive disorder, not elsewhere classified; Axis III – Plantar fascial fibromatosis; Axis IV – Loss of mother and grandmother; and Axis V – GAF of 55.  (*Id*. at 302.)

Plaintiff had another appointment with Dr. Singh on August 31, 2011.  (*Id*. at 305-06.)  On this date, Dr. Singh noted that Plaintiff reported no new issues and indicated that her mood was better, that she was not having mood swings, and that her sleep and appetite were good.  (*Id.* at 305.)  Plaintiff again reported that she was maintaining her routine activities with interest; she

23

denied any manic, psychotic or depressive symptoms; and she stated that she felt better with the recent adjustment in medication.  (*Id.*)  Dr. Singh noted the same diagnoses, on Axes I, IV, and V, as had been noted in the previous appointment, and, on Axis III, listed "[r]outine general medical examination at a health care facility."  (*Id.* at 306.)

On September 14, 2011, Plaintiff returned to the Clinic and saw Dr. Singh again.  (*Id.* at 307.)  The report from this visit states that Plaintiff had not been taking her Venlafaxine because she needed prior authorization, and her prescription had not been filled.  (*Id.*)  Plaintiff complained of decreased interest, poor concentration, low energy levels, and a depressed mood.  (*Id.*)  Dr. Singh noted an Axis I diagnosis of "major depressive disorder, recurrent episode, moderate," and a GAF score of 55.  (*Id.* at 307.)  On the same date, Dr. Singh wrote a letter, similar in language to Dr. Shah's August 3 letter, stating that Plaintiff was "exhibiting decreased interest, poor concentration, [and] low energy."  (*Id.* at 350.)  She estimated that Plaintiff's recovery would take six months from August 3, 2011.  (*Id.*)

Plaintiff had several follow-up visits with Dr. Raul Calicdan from September to December 2011.  On September 30, 2011, Dr. Calicdan noted that Plaintiff had run out of medication and that her affect and mood were "constricted."  (*Id.* at 308.)  Plaintiff reported that she had not been experiencing any side effects from the medication.  (*Id.*)  Dr. Calicdan noted that her primary diagnosis was "[d]epressive disorder, not elsewhere classified," and that her GAF score was 60.  (*Id.*)  Dr. Calicdan indicated that Plaintiff should "continue current medication as maintenance dose to keep her stable and out of [the] hospital."  (*Id.*)  Plaintiff saw Dr. Calicdan again on October 25, 2011, at which time Plaintiff again stated that she was running out of medication and reiterated that she was not having side effects.  (*Id.* at 310.)  Dr. Calicdan noted that Plaintiff was "[r]esponding to counseling and pyscho education," but that her affect

and mood were dysphoric.  (*Id*.)  Plaintiff's diagnoses remained the same, except that, this time,

Dr. Calicdan recorded a GAF score of 55.  (*Id*.)  Plaintiff next saw Dr. Calicdan on December 2,

2011, and she reported no problems.  (*Id*. at 314.)  Dr. Calicdan again stated that Plaintiff was

"responding to counseling and psycho education," listed the same diagnoses as before, and, on

this visit, reported a GAF score of 60.  (*Id*.)

On January 4, 2012, Plaintiff had an individual psychotherapy session with Dr. Ann B.

Whitmarsh.[40]  (*Id*. at 392-93.)  The report from this session again lists a primary diagnosis of

"depressive disorder, not elsewhere classified," and reports a GAF score of 70.[41]  (*Id*.)

Next, Plaintiff had a follow-up appointment with Dr. Singh on January 6, 2012.  (*Id*.

at 316-18.)  Dr. Singh recorded a score of five for Plaintiff on a PHQ-9 assessment.[42]  (*Id*.

at 317.)  He reported that Plaintiff's mood was low, but that she was alert and oriented, and her

speech was clear and logical.  (*Id*.)  Dr. Singh recorded a primary diagnosis of depressive

disorder, not elsewhere classified, and reported a GAF of 60.  (*Id*.)

---

[40] In addition to the clinic visits described above, Plaintiff also participated in an anger management group with Dr. Whitmarsh from June 2011 through at least November 2011.  (*See id*. at 297-98, 303-04, 358, 365, 371-72, 384, 386, 389.)  In her initial reports, Dr. Whitmarsh listed a primary diagnosis for Plaintiff of "depressive disorder, not elsewhere classified" (*see, e.g., id*. at 297), but, at the end of 2011, Dr. Whitmarsh listed a primary diagnosis of "major depressive disorder, recurrent episode, moderate" (*id*. at 389).  The GAF scores listed for Plaintiff by Dr. Whitmarsh, over this period, tended to range from 60 to 65.  (*See e.g., id*. at 297, 298, 389; *see also infra* at n.41.)

[41] A GAF of 61 to 70 reflected that a person had "some mild symptoms (*e.g.*, depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but [was] generally functioning pretty well, ha[d] some meaningful interpersonal relationships." DSM–IV at 34.

[42] The PHQ ("Patient Health Questionnaire")-9 is used to measure the severity of depression. A score of five indicates mild depression.  *See* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495268/ (last accessed Mar. 3, 2015).

Plaintiff then saw Dr. Calicdan again on February 6, 2012.  (*Id.* at 319-22.)  The report

from that appointment notes that Plaintiff continued to feel depressed.  (*Id.* at 319.)  Dr. Calicdan

indicated that Plaintiff's affect and mood were "constricted."  (*Id.*)  Her primary diagnosis and

GAF remained the same as recorded during her previous appointment with Dr. Singh.  (*Id.*

at 320.)

### C.   **Procedural History**

#### 1.   **Plaintiff's SSI Application**

On August 26, 2010, Plaintiff filed an application for SSI, alleging disability as of

December 27, 2007.  (*Id.* at 138, 182; *see also supra* at n.2.)  On October 29, 2010, Plaintiff

amended her application.[43]  (*Id.* at 146-47.)  Plaintiff's application was denied on January 6,

2011 (*id.* at 84-88), and Plaintiff subsequently filed a request for a hearing on May 18, 2011 (*id.*

at 97-99).[44]

#### 2.   **Administrative Hearing and Decision**

On February 28, 2012, Plaintiff, represented by her attorney Michael S. Aranoff, Esq.,

appeared and testified before the ALJ.  (*See generally id.* at 62-82.)  Plaintiff testified that she

was unable to work for a number of reasons, including the lingering effects of a right ankle

fracture, plantar fasciitis in her left foot, back pain, anxiety, and depression.

---

[43] The amendment appears to concern the number of hours Plaintiff was then working per week.  In her initial application, Plaintiff indicated that she was working 12 hours per week (R. at 139), but, in the amended application, Plaintiff did not indicate how many hours she was working (*id.* at 146).

[44] While Plaintiff's request for a hearing was submitted beyond the requisite 60-day period, the SSA apparently accepted Plaintiff's explanation that her application was late due to the death of her mother (*see id.* at 97) as a "good reason" for the delay, and granted her request for a hearing (*see id.* at 90-91).

Plaintiff testified that, in 2007, she fell in a hole in the road and fractured her right ankle. (*Id.* at 69-70.) She explained that, while this injury did not require surgery, she was in a cast until January of 2008. (*Id.* at 70.) Thereafter, doctors put her in an ankle brace, in which she remained until May or June of 2008. (*Id.*) Plaintiff stated that, upon removal of the ankle brace, she attended physical therapy sessions. (*Id.*)

Plaintiff testified that the injury to her right ankle and the resulting cast on her right foot had caused her to compensate by placing most of her weight on her left foot, which had led to the development of plantar fasciitis in her left foot. (*Id.* at 71.) Plaintiff stated that she had undergone plantar fasciitis surgery on December 8, 2011, but that the surgery was unsuccessful, as she remained in a brace indefinitely and was still in pain. (*Id.* at 71, 73-74, 80.) Plaintiff stated that she only took prescribed Tylenol for her pain and that it did not help her at all, but her doctor would not prescribe anything stronger, out of concern that an anti-inflammatory drug could interfere with the healing process. (*Id.* at 74.)

Plaintiff testified that her "foot doctor" (presumably referring to Dr. Quinn) had recommended that she keep her foot elevated for intervals of 10 to 20 minutes when she was seated, but that this was problematic because she had been experiencing back pain since her right ankle fracture in 2007. (*Id.* at 71-72.) Plaintiff stated that her back and leg pain prevented her from sitting for long periods of time, and that she would be unable to perform a job while sitting down. (*Id.* at 72-73.) Plaintiff estimated that, at the time of the hearing, she could stand or walk for 10 to 20 minutes at a time, but that before the surgery, she had been able to stand or walk for about three hours. (*Id.* at 75.) She stated that she had traveled to the hearing with her daughter because she could not travel alone, as she experienced shortness of breath when walking. (*Id.* at 66.) She also stated that she had been using a cane daily since her plantar fasciitis surgery.

(*Id*. at 78.)  Plaintiff testified that she was also unable to lift objects, due to the pain she felt in her back and legs.  (*Id*. at 80-81.)

Plaintiff also testified about her anxiety and depression.  (*See generally id*. at 75-79.)  She stated that her depression had begun after she fractured her ankle in 2007 (*id*. at 76-77), and that she had received two to three months of treatment at Roosevelt, before starting treatment at Harlem Hospital in March of 2011 (*id*. at 78-79).  Plaintiff testified that she had been seeing Dr. Calicdan,[45] a psychiatrist at Harlem Hospital, since September of 2011, for her anxiety and depression.  (*Id*. at 76.)  Plaintiff also stated that she was on medication, including Buspirone and Venlafaxine, for her depression, but that the medication produced headaches and did not help improve her depression.  (*Id*. at 76, 79.)  She reported that, since the onset of her depression in 2007, she had experienced problems sleeping, difficulty concentrating, weight fluctuation, loss of appetite, and disinterest in activities she used to enjoy.  (*Id*. at 77-78.)  She also reported that, since September of 2011, she sometimes heard voices call her name.  (*Id*. at 80.)

Regarding her prior employment, Plaintiff testified that her most recent job had involved working three days a week with children and autistic individuals.  (*Id*. at 68.)  She explained that she could not have performed the job if it had been full-time, due to her physical pain and depression.  (*Id*. at 69.)  Plaintiff stated that she had experienced difficulty doing the work because it had involved walking and standing, which had caused her pain; she testified that she had stopped working in July of 2011 because "she couldn't take [the pain] any longer."  (*Id*. at 68, 73.)  As of the date of the hearing, she explained that she stayed home during the day, and

---

[45] The transcript from the hearing refers, at points, to "Dr. Kaliktan (phonetic)" and "Dr. Kalidan (phonetic)" (*id*. at 76, 79).  This Court assumes these are references to Dr. Calicdan.

she noted that her children took care of household chores, such as cooking, cleaning, and laundry.  (*Id.* at 75.)

On March 16, 2012, the ALJ issued a decision finding that Plaintiff was not disabled under the Social Security Act, and thus not entitled to SSI.  (*See generally id.* at 44-57.)  The ALJ's decision is discussed in detail below.  (*See* Discussion *infra*, at Section II.)

### 3.      Plaintiff's Request for Review by the Appeals Council

On May 10, 2012, Plaintiff filed a request with the Appeals Council for review of the ALJ's decision.  (*Id.* at 40.)[46]  In support of this request, Plaintiff, through counsel, submitted a letter to the Appeals Council, laying out detailed factual and legal arguments as to why reversal of the ALJ's decision was required.  (*See id.* at 225-30.)

On March 18, 2013, the Appeals Council denied Plaintiff's request for review.  (*Id.* at 1-6.)  The notice of denial of review stated, without explanation, that the Appeals Council had "considered the reasons [Plaintiff] disagree[d]with the decision [of the ALJ]," but "found that this information d[id] not provide a basis for changing the [ALJ's] decision."  (*Id.* at 1-2.)  As a result, the ALJ's decision became the final decision of the Commissioner.  (*Id.* at 1.)

### D.      The Motions Before This Court

On May 10, 2013, Plaintiff, proceeding *pro se*, filed her Complaint in this action, seeking review of the Commissioner's decision.  (*See generally* Complaint, dated May 10, 2013 (Dkt. 2).)  Counsel appeared on Plaintiff's behalf on January 31, 2014.  (Dkt. 14.)  Defendant

---

[46] Although the form filed by Plaintiff upon her request for review does not indicate its filing date (*see id.*), the Index to the Administrative Record lists this request as having been filed on May 10, 2012 (*see* Dkt. 21), which is also the date shown on the brief submitted by Plaintiff's counsel to the Appeals Council, in connection with Plaintiff's request for review (*see* R. at 225-30).

answered the Complaint on April 25, 2014.  (*See generally* Answer, dated April 25, 2014 (Dkt. 20).)

On June 17, 2014, Plaintiff moved for judgment on the pleadings (Dkt. 23), and submitted a memorandum of law in support of her motion (Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure ("Pl. Mem."), dated June 17, 2014 (Dkt. 24)).  Plaintiff argues that the Commissioner's decision should be reversed or remanded because:  (1) the ALJ failed to accord the proper weight to the opinion of Plaintiff's treating podiatrist; (2) the ALJ's determination that Plaintiff was not credible was not supported by substantial evidence; (3) the ALJ committed legal error by relying on the SSA's Medical Vocational Guidelines (commonly referred to as the "Grids"), rather than calling a vocational expert to evaluate whether Plaintiff was capable of performing work that existed in the national economy; and (4) Defendant failed to consider the combined effect of all of Plaintiff's medical and psychiatric conditions.  (*See generally*, Pl. Mem.)

On November 7, 2014, Defendant filed a cross-motion (Dkt. 28) and supporting memorandum (Defendant's Memorandum of Law In Opposition to Plaintiff's Motion for Judgment on the Pleadings and in Support of Her Cross-Motion for Judgment on the Pleadings ("Def. Mem."), dated Nov. 7, 2014 (Dkt. 29)).  Defendant argues that the final decision of the Commissioner should be upheld because it was based upon the application of correct legal standards and was supported by substantial evidence.  (*See generally*, Def. Mem.)

On December 8, 2014, Plainitff filed a reply.  (Plaintiff's Reply Memorandum ("Pl. Reply Mem."), dated Dec. 8, 2014 (Dkt. 31).)

## DISCUSSION

## I.   APPLICABLE LEGAL STANDARDS

### A.   Standard of Review

Judgment on the pleadings under Rule 12(c) is appropriate where "the movant establishes 'that no material issue of fact remains to be resolved,'" *Guzman v. Astrue*, No. 09cv3928 (PKC), 2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (quoting *Juster Assocs. v. City of Rutland*, 901 F.2d 266, 269 (2d Cir. 1990)), and a judgment on the merits can be made "'merely by considering the contents of the pleadings,'" *id.* (quoting *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988)).

Judicial review of a decision of the Commissioner is limited.  The Commissioner's decision is final, provided that the correct legal standards are applied and findings of fact are supported by substantial evidence.  42 U.S.C. § 405(g); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000).  "Where an error of law has been made that might have affected the disposition of the case, [a] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ."  *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (internal quotation marks and citation omitted).  Thus, the first step is to ensure that the Commissioner applied the correct legal standards.  *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

The next step is to determine whether the Commissioner's decision is supported by substantial evidence.  *See Tejada*, 167 F.3d at 773.  Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted).  In making

this determination, a court must consider the underlying record.  The reviewing court does not, however, decide *de novo* whether a claimant is disabled.  *See Veino v. Barnhart,* 312 F.3d 578, 586 (2d Cir. 2002) ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner."); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997).  Therefore, if the correct legal principles have been applied, this Court must uphold the Commissioner's decision upon a finding of substantial evidence, even where contrary evidence exists.  *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."); *see also DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir. 1998) (affirming an ALJ decision where substantial evidence supported both sides).

### B.    The Five-Step Sequential Evaluation

To be entitled to disability benefits under the Act, a claimant must establish his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  An individual is considered to be under a disability only if the individual's physical or mental impairments are of such severity that he or she is not only unable to do his or her previous work, but also cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In evaluating a disability claim, an ALJ must follow the five-step procedure set out in the regulations governing the administration of Social Security benefits. *See* 20 C.F.R. § 416.920; *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam). Throughout the inquiry, the ALJ must consider four primary sources of evidence: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (citations omitted).

The first step of the inquiry requires the ALJ to determine whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i). If not, at the second step, the ALJ determines whether the claimant has a "severe" impairment or combination of impairments that significantly limit his or her physical or mental ability to do basic work activities. *Id.* § 416.920(a)(4)(ii), (c). If the claimant does suffer from such an impairment, then the third step requires the ALJ to determine whether this impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"). *Id.* § 416.920(a)(4)(iii). If it does, then the claimant is presumed to be disabled "without considering [the claimant's] age, education, and work experience." *Id.*

Where the plaintiff alleges a mental impairment, steps two and three require the ALJ to apply a "special technique," outlined in 20 C.F.R. § 416.920a to determine the severity of the claimant's impairment at step two, and to determine whether the impairment meets a Listing at step three. *See Kohler v. Astrue*, 546 F.3d 260, 265-66 (2d Cir. 2008). If the claimant is found to have a "medically determinable mental impairment," the ALJ is required to "specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s)" and then to "rate the degree of functional limitation resulting from the impairment(s) in

accordance with paragraph (c) of [Section 416.920a]," which specifies four broad functional areas:  (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation."[47]  20 C.F.R. §§ 416.920a(b)(2), (c)(3); *see Kohler*, 546 F.3d at 266.  The functional limitations for these first three areas are rated on a five-point scale of "[n]one, mild, moderate, marked, [or] extreme," and the limitation in the fourth area (episodes of decompensation) is rated on a four-point scale of "[n]one," "one or two," "three," or "four or more."  20 C.F.R. § 416.920a(c)(4).

If the claimant's impairment does not meet or equal a listed impairment at step three, then the ALJ must determine, based on all the relevant evidence in the record, the claimant's RFC, or ability to perform physical and mental work activities on a sustained basis.  *Id.* § 416.945.  The ALJ then proceeds to the fourth step of the inquiry, which requires the ALJ to determine whether the claimant's RFC allows the claimant to perform his or her "past relevant work."  *Id.* § 416.920(a)(4)(iv).  Finally, if the claimant is unable to perform his or her past relevant work, then the fifth step requires the ALJ to determine whether, in light the claimant's RFC, age, education, and work experience, the claimant is capable of performing "any other work" that exists in the national economy.  *Id.* § 416.920(a)(4)(v), (g).

On the first four steps of the five-step evaluation, the claimant generally bears the burden of establishing facts to support his or her claim.  *See Berry*, 675 F.2d at 467.  At the fifth step, the burden shifts to the Commissioner to "show that there is work in the national economy that the claimant can do."  *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *see also Bluvband v.*

---

[47] "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  *Morales v. Colvin*, No. 13cv4302 (SAS), 2014 WL 7336893, at *8 (S.D.N.Y. Dec. 24, 2014) (quoting *Kohler*, 546 F.3d at 266 n.5).

*Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).  The Commissioner must establish that the alternative work "exists in significant numbers" in the national economy and that the claimant can perform this work, given his or her RFC and vocational factors.  20 C.F.R. § 416.960(c)(2).

Where the claimant only suffers from exertional impairments, the Commissioner can satisfy this burden by referring to the Grids, set out in 20 C.F.R. § 404, Subpart P, Appendix 2. Where, however, the claimant suffers non-exertional impairments (such as mental impairments) that "'significantly limit the range of work permitted by his [or her] exertional limitations,' the ALJ is required to consult with a vocational expert," rather than rely exclusively on these published Grids.  *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986)).

## C.    Duty to Develop Record

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record," *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citing *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)), and failure to develop the record may be grounds for remand, *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999).  The SSA regulations explain this duty to claimants this way:

> Before we make a determination that you are not disabled, we will develop your complete medical history . . . [and] will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports.
>
> . . . Every reasonable effort means that we will make an initial request for evidence from your medical source and, at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received, we will make one followup request to obtain the medical evidence necessary to make a determination.

20 C.F.R. § 416.912(d), (d)(1).  The regulations further explain that a claimant's "complete medical history" means the records of his or her "medical source(s)."  *Id*. § 416.912(d)(2).[48]

For all claims adjudicated prior to March 26, 2012, an ALJ's duty to develop the record explicitly extended to situations in which "the report from [the claimant's] medical source contain[ed] a conflict or ambiguity that [needed to] be resolved."  20 C.F.R. § 416.912(e)(1) (2011) (removed by amendment dated Mar. 26, 2012); *see, e.g.*, *Lowry v. Astrue,* 474 Fed. App'x 801, 804 n.2 (2d Cir. 2012); *Ulloa v. Colvin*, No. 13cv4518 (ER), 2015 WL 110079, at *11 n.6 (S.D.N.Y. Jan. 7, 2015) (adopting report and recommendation).

Where there are no "obvious gaps" in the Record and where the ALJ already "possesses a complete medical history," the ALJ is not "under an obligation to seek additional information in advance of rejecting a benefits claim."  *Swiantek v. Comm'r of Soc. Sec.*, 588 Fed. App'x 82, 84 (2d Cir. 2015) (Summary Order) (quoting *Rosa*, 168 F.3d at 79 n.5).

### D.    The Treating Physician Rule

The medical opinion of a treating source as to "the nature and severity of [a claimant's] impairments" is entitled to "controlling weight," where the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record."  20 C.F.R. § 416.927(c)(2).  A "treating source" is defined as the claimant's "own physician, psychologist, or other acceptable medical source

---

[48] Additionally, if the information obtained from medical sources is insufficient to make a disability determination, or if the ALJ is unable to seek clarification from treating sources, the regulations provide that the ALJ should ask the claimant to attend one or more consultative evaluations.  20 C.F.R. §§ 416.912(e), 416.917.

who . . . has provided [the claimant] with medical treatment or evaluation" and who has had "an ongoing treatment relationship" with him or her.  20 C.F.R. § 416.902.[49]

Where an ALJ determines that a treating physician's opinion is not entitled to "controlling weight," the ALJ must "give good reasons" for the weight accorded to the opinion. 20 C.F.R. § 416.927(c)(2).  Failure to "give good reasons" is grounds for remand.  *Halloran v. Barnhart*, 632 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion . . . .").  Moreover, in determining the weight to be accorded to an opinion of a treating physician, the ALJ "must apply a series of factors," *Aronis v. Barnhart*, No. 02cv7660 (SAS), 2003 WL 22953167, at *5 (S.D.N.Y. Dec. 15, 2003) (citing 20 C.F.R. § 416.927(d)(2)[50]), including:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including whether the treatment received was particular to the claimant's impairment; (3) the supportability of the physician's opinion; (4) the consistency of the physician's opinion with the record as a whole; and (5) the specialization of the physician providing the opinion, 20 C.F.R. § 416.927(c)(2)-(5); *see Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) (noting that these five factors "must be considered when the treating physician's opinion is not given controlling weight").

Even where a treating physician's opinion is not entitled to "controlling weight," it is generally entitled to "more weight" than the opinions of non-treating and non-examining

---

[49] A medical source who has treated or evaluated the claimant "only a few times" may be considered a treating source "if the nature and frequency of the treatment or evaluation is typical for [the claimant's] condition(s)."  20 C.F.R. §§ 404.1502, 416.902.

[50] On February 23, 2012, the Commissioner amended 20 C.F.R. § 416.927, by, among other things, removing paragraph (c), and redesignating paragraphs (d) through (f) as paragraphs (c) through (e).

sources.  20 C.F.R. § 416. 927(c)(2); *see* Social Security Ruling 96-2p (S.S.A. July 2, 1996) ("In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."); *see also Gonzalez v. Apfel*, 113 F. Supp. 2d 580, 589 (S.D.N.Y. 2000).  A consultative physician's opinion, by contrast, is generally entitled to "little weight."  *Giddings v. Astrue*, 333 F. App'x 649, 652 (2d Cir. 2009) (internal quotation marks and citation omitted).[51]

### E.    Assessment of a Claimant's Credibility

Assessment of a claimant's credibility with respect to subjective complaints of pain involves a two-step process.  Where a claimant complains that he or she is limited by pain, the ALJ is required, first, to determine whether the claimant suffers from a "medically determinable impairment[] that could reasonably be expected to produce" the pain alleged.  20 C.F.R. § 416.929(c)(1).  Assuming the ALJ finds such an impairment, then the ALJ must take the second step of evaluating the intensity and persistence of the claimant's symptoms.  *Id.*; *see also Meadors v. Astrue*, 370 Fed. App'x 179, 183 (2d Cir. 2010).  This must be done by considering all of the available evidence, and, where "the claimant's pain contentions are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry" to determine the extent to which the claimant's symptoms affect his or her ability to do basic work activities.

---

[51] Treating physicians' opinions are generally accorded deference because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of a claimant's condition and "bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c); *see Taylor v. Barnhart*, 117 F. App'x 139, 140 (2d Cir. 2004).  Consultative examinations, on the other hand, "are often brief, are generally performed without benefit or review of the claimant's medical history, and, at best, only give a glimpse of the claimant on a single day.  Often, consultative reports ignore or give only passing consideration to subjective symptoms without stated reasons."  *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 55 (2d Cir. 1992) (internal quotation marks and citation omitted).

*Meadors*, 370 Fed. App'x at 183 (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii)[52]); *Taylor v. Barnhart*, 83 Fed. App'x 347, 350-51 (2d Cir. 2003) (summary order); *See* Social Security Ruling ("SSR") 96-7P (S.S.A. July 2, 1996).)

"While an ALJ 'is required to take [a] claimant's reports of pain and other limitations into account' [in making a credibility determination] . . . he or she is 'not required to accept the claimant's subjective complaints without question.'" *Campbell v. Astrue*, 465 Fed. App'x 4, 7 (2d Cir. 2012) (Summary Order) (quoting *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010)). "Rather, the ALJ may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Id.* The ALJ must, however, include "specific reasons for [his or her] finding on credibility, supported by the evidence in the case record," and the reasons must make it sufficiently clear for a reviewer to determine "the weight the [ALJ] gave to the [claimaint's] statements and the reasons for that weight." SSR 96-7p. The ALJ should consider:

> (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; (5) other treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the pain; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain.

(*Meadors*, 370 Fed. App'x at 184 n.1 (citing 20 C.F.R. § 404.1529(c)(3)(i-vii)).)

---

[52] Although the particular regulation cited in the *Meadors* decision does not apply to SSI claims, a related regulation that does apply to such claims contains the same language. *See* 20 C.F.R. § 416.929(c)(3)(i)-(vii).

II.     **THE ALJ'S DECISION**

In this case, after reviewing the evidence under the five-step procedure, the ALJ concluded that Plaintiff did not have a disability within the meaning of the Act.  (*See generally* R. 44-57.)

A.     **Step One**

At step one of the five-step sequential evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 26, 2010, the date of Plaintiff's application for SSI.  (*Id.* at 46.)  The ALJ noted that, up to July of 2011, Plaintiff had worked 12 hours per week at a center for autistic children, but found that her earnings from that part-time employment were "below substantial gainful activities levels."  (*Id.*)

B.     **Step Two**

At step two, the ALJ found that Plaintiff had certain physical impairments – including a right ankle fracture, a left foot that was "status post surgery" for plantar fasciitis, disc bulging at the C6-C7 level, and degenerative changes in the thoracic spine – that were "severe," in that they imposed "more than a minimal limitation on [Plaintiff's] basic work activities."  (*See id.*)  The ALJ also found that Plaintiff had a "medically determinable mental impairment of adjustment disorder and depression," but, based on his review of the Record, the ALJ determined that this mental impairment "[did] not cause more than minimal limitation[s] in [Plaintiff's] ability to perform basic mental work activities and [was] therefore non-severe."  (*Id.*)

In making this step-two finding of non-severity with respect to Plaintiff's medically determinable mental impairment, the ALJ primarily relied on the November 2010 consultative report of Dr. Fujiwaki – to whose opinions the ALJ assigned "great weight" – and certain treatment records, which the ALJ found to be consistent with Dr. Fujiwaki's expressed opinions.

(*See id.*, at 47.)  In particular, the ALJ cited the opinions of Dr. Fujiwaki that Plaintiff was "able to follow and understand simple directions and instructions"; "could perform simple tasks independently, maintain attention and concentration, and maintain a regular schedule"; and "could learn new tasks, perform complex tasks independently, and make appropriate decisions." (*Id.*)  He also cited to Dr. Fujiwaki's observations that, *inter alia*, Plaintiff was "cooperative"; her "manner of relating, social skills, and overall presentation were adequate"; she was "coherent and goal directed"; she had "a full range of affect, and was appropriate in speech and thought content"; her "attention, concentration, and memory were intact"; and she had "fair judgment and insight into her condition."  (*Id.*)  As to Plaintiff's activities of daily living, the ALJ noted Dr. Fujiwaki's opinion that Plaintiff could dress, bathe, groom herself, prepare food, clean, launder, shop for food, manage money, drive, and take public transportation alone.  (*Id.*)  Finally, the ALJ cited Dr. Fujiwaki's findings that Plaintiff "socialized with her cousin, liked watching movies, . . . spent her days working part time and talking to her children[,] . . .[and] also watched television."  (*Id.*)  The ALJ explained that Dr. Fujiwaki's opinions were entitled to great weight not only because they were "consistent with the clinical signs and supported by the medical evidence," but also because Dr. Fujiwaki had personally "examined [Plaintiff] and performed a series of clinical tests."  (*Id.*)[53]

   In surveying the evidence in the Record that, according to the ALJ, supported Dr. Fujiwaki's opinions, the ALJ first referred to the notes of Dr. Anson, who saw Plaintiff in August 2010 at St. Luke's, when she first began treatment for her mental impairment.  (*See id.*

---

[53] The ALJ later stated that he gave "little weight" to the opinion of Dr. Altmansberger, a psychiatric consultant who had found Plaintiff to have moderate restrictions in in certain functional areas, because that opinion was inconsistent with Dr. Fujiwaki's, and Dr. Fujiwaki (apparently unlike Dr. Altmansberger) had had the benefit of examining Plaintiff.  (*See id.* at 49.)

at 47-48.)[54]  The ALJ noted that, although Plaintiff reported symptoms, at that time, of "decreased appetite, low energy, loss or interest in her work, and poor sleep," she was not found to exhibit "hopelessness, active suicidal thoughts, [or] . . . marked psychomotor retardation," and she was reported to be able to "get out of bed to take care of her children and make it to work." (*Id*. at 48.)  Further, the ALJ noted that, while Plaintiff complained of "poor concentration," she was reported to be able to "concentrate at work."  (*Id*.)  The ALJ also noted that, although Plaintiff was prescribed Lexapro, she was only prescribed 10 mg, which the ALJ described as "a very low dosage of the medication."  (*Id*.)

The ALJ proceeded to remark that "[t]here was very little evidence [of] . . . treatment from August 2010 to June 2011," which, according to the ALJ, suggested that Plaintiff's mental impairment "did not impose limitations."  (*Id*.)[55]  As for the records that did exist for 2011 and 2012, the ALJ found that the "[l]ater progress notes failed to show [that Plaintiff had] restrictions related to [her] . . . mental impairment."  (*Id*. at 48.)  With respect to Plaintiff's records from her anger management group sessions with Dr. Whitmarsh (*see supra* at n.40), the ALJ noted that the physicians with that group had "usually reported normal clinical signs," and that, during the period of Plaintiff's treatment, she had been found to have "intact or fair insight and judgment," with "no evidence of manic or psychotic symptoms."  (*Id*.)  The ALJ also mentioned that

---

[54] In describing these notes, the ALJ did not actually name Dr. Anson (the only doctor whose name appears on the document (*see id*. at 238-39)), but rather referred vaguely, in the plural, to "physicians" who supposedly saw Plaintiff at that time (*see id*. at 47-48 (noting that "physicians initially diagnosed [Plaintiff]," that "[t]hey found no evidence" of certain symptoms, and that "[p]hysicians prescribed Lexapro")).

[55] In this regard, the ALJ did not make any reference to the fact that Dr. Anson's August 2010 notes indicate that, after that visit, Plaintiff was expected to have regular follow-up for "psychopharm management" (*see id*. at 239), or to the fact that, upon eventually being seen at Harlem Hospital in March 2011, Plaintiff reported that she was still "on Lexapro" (*id*. at 352). Rather, the ALJ seemed to infer from a lack of evidence that, for a significant interval, Plaintiff stopped seeking mental health treatment after her August 2010 visit to Dr. Anson.

Plaintiff had been found by these physicians to have "generally been well groomed and with good hygiene, [to have had] a calm and cooperative attitude, and [to have] had no psychomotor retardation or agitation."  (*Id*. at 48-49.)  The ALJ further noted that, at her most recent mental examination, in February 2012, it was reported that Plaintiff "was responding to counseling and psycho education, that her activities of daily living were well, and that there was no evidence of acute cognitive deficits."  (*Id*. at 49.)

 While the ALJ took note of records showing that physicians at Harlem Hospital had prescribed Plaintiff Effexor (Venlafaxine) and Buspar (referred to above by its trade name Buspirone) (*id*. at 48), he observed that Plaintiff's dosage of Velafaxine had been increased only once, in August 2011, and that her dosage of Buspar had been decreased at Plaintiff's request, as she had reported that it made her dizzy.  (*Id*. at 48.)  According to the ALJ, the fact that Plaintiff's dosage of these two medications then remained the same "suggest[ed] that her condition did not worsen and that she [had] not had significant problems with side effects to the medication."  (*Id*.)[56]  The ALJ further observed that, in July 2011, Plaintiff had been instructed "to stop alternating between psychiatric medications and the medication associated with her physical impairments, which suggest[ed] that she did not take her medication as instructed." (*Id*.)  The ALJ also noted that Plaintiff later reported improvement with medication, informing her doctors on August 3 and December 2, 2011, for example, that "she had no depressive symptoms."  (*Id*.)

To the extent the ALJ considered the expressed opinions of any of Plaintiff's mental health treaters at Harlem Hospital – including Drs. Jolayemi, Singh, and Calicdan – the ALJ gave each of those opinions only "little weight."  (*See id*. at 48, 49.)  According to the ALJ, the letter

---

[56] The ALJ did not note that Plaintiff had also been prescribed other psychiatric medications, including Sertraline (*see supra* at n.36) and Abilify (*see supra* at n.39).

that Dr. Jolayemi wrote regarding Plaintiff in June 2011 (in which Dr. Jolayemi stated that Plaintiff should take time off from work, and that environmental stressors could lead to "decompensation in her condition" (*see id.* at 295)), was not entitled to greater weight because "[t]he letter did not identify any factors," and "did not have progress notes to support this opinion" (*id.* at 48).  The ALJ similarly discounted Dr. Singh's September 2011 letter (indicating that Plaintiff would need six months for recovery) because, even though Dr. Singh had "identified clinical signs such as poor concentration, low energy, and decreased interest," he had, in the ALJ's view, "uncritically accepted as true most, if not all," of Plaintiff's reports of her own symptoms.  (*Id.* at 49.)  Lastly, the ALJ determined that an opinion purportedly given by Dr. Calicdan, that Plaintiff would be unable to work for six months,[57] was only entitled to little weight because, in the ALJ's view, it was unsupported by the medical evidence, and because Dr. Calicdan "did not identify the limitations that [Plaintiff] had that would explain this inability to work."  (*Id.*)

In light of his review of the medical evidence, the ALJ determined that it did not fully support Plaintiff's testimony regarding the duration and extent of her mental impairment, "thereby diminishing her credibility."  (*Id.*)  Specifically, the ALJ found that Plaintiff's testimony that she had developed her mental impairment in 2007, after injuring her right ankle (*see id.* at 47) was unsupported, as the Record showed that she did not seek mental health treatment until August 2010 (*see id.* at 47, 49).  The ALJ also observed that, while Plaintiff had testified that her medication produced headaches (*see id.* at 47, 49), her treatment notes from

---

[57] Although the ALJ indicated that Dr. Calicdan "noted that he wrote" a letter suggesting this (*id.* at 49), Dr. Calicdan's treatment notes of February 6, 2012 only indicate that such a letter had been written (*see id.* at 319), and, as the Record does not include a copy of any such letter authored by Dr. Calicdan, this reference in his treatment notes may have been a reference to the September 2011 letter written by Dr. Singh.

August 2011 to February 2012 indicated that she had not reported side effects (*id*. at 49).  The ALJ additionally pointed out that Plaintiff's testimony that her depression had not improved with medication (*id*. at 47, 49), was contradicted by records of her visits with treating doctors, who noted improvement (*see id.* at 49).

Finally, in making his step-two determination regarding the severity of Plaintiff's mental impairment, the ALJ stated that he had considered whether Plaintiff had any limitations in the four relevant domains of functioning.  (*See id*. at 49-50 (citing 20 C.F.R., Pt. 404, Subpt. P, App. 1).)  He found that Plaintiff had "no limitations" in her activities of daily living, that she had only "mild restrictions" in social functioning, that she also had only "mild limitations" in maintaining concentration, persistence or pace, and that she had experienced "no episodes of decompensation that ha[d] been of extended duration."  (*Id*. at 50.)  He concluded that "[b]ecause [Plaintiff's] medically determinable mental impairment cause[d] no more than 'mild' limitation in any of the first three functional areas and 'no' episodes of decompensation . . . in the fourth area," the impairment was non-severe.  (*Id*.)

## C.   <u>Step Three</u>

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1.  (R. at 50.)  The ALJ stated that he had "reviewed all of the evidence" in reaching this conclusion.  (*Id*.)

## D.   <u>RFC Analysis</u>

Prior to moving on to step four of the evaluation, the ALJ conducted an RFC assessment, in which he only considered evidence regarding Plaintiff's physical impairments.  (*See generally id.* at 51-55.)  Even though the ALJ had stated, at step two, that his determination of the

non-severity of Plaintiff's mental impairment did not constitute an RFC assessment, and that the "[RFC] assessment used at steps [four] and [five] . . . require[d] a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings"[58] (*id*. at 50), the ALJ omitted any reference to Plaintiff's mental impairment when he went on to determine Plaintiff's RFC (*see generally id.* at 51-55).

The ALJ began his RFC assessment with a brief description of Plaintiff's education and work history, and then examined her testimony regarding the effects of her physical impairments.  (*Id*. at 51.)  Specifically, the ALJ noted that Plaintiff had testified that she had difficulty sitting, both because she needed to have her leg elevated for 20 minutes and then to stand, and because she suffered from back pain.  (*Id*.)  The ALJ also noted Plaintiff's testimony that, after she had her plantar fasciitis surgery, she could only walk for up to 20 minutes (as compared to the three hours that she could walk, before her surgery), that her children performed certain household chores, and that she could not lift because of back and leg pain.  (*Id*.)  After reviewing the evidence, the ALJ found that "[Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms[,]" but also found that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent they [were] inconsistent with the . . . [RFC] assessment."  (*Id*. at 51-52.)

In evaluating Plaintiff's RFC, the ALJ appeared to rely primarily on the opinion of consultative physician Dr. Mescon, who had opined that there were no limitations on Plaintiff's ability to sit, but that Plaintiff was moderately limited in her ability to "stand for long periods of time, climb, push, pull, or carry heavy objects" due to "ankle and heel pain."  (*Id.* at 52.)  The

---

[58] *See supra* at n.35.

ALJ accorded "significant weight" to this opinion because he found that it was consistent with the clinical signs and supported by the medical evidence. (*Id*.) The ALJ stated that this weight was also supported by the fact that Dr. Mescon had examined Plaintiff and performed a series of clinical tests, and that the assessment was within Dr. Mescon's area of expertise. (*Id.*)

The ALJ then proceeded to give a detailed summary of the medical evidence regarding the "conditions with [Plaintiff's] lower extremities." (*See generally id.* at 52-55.) Specifically, the ALJ discussed Plaintiff's right distal fibula fracture on December 27, 2007 and later progress reports, which indicated that Plaintiff had tolerated walking with a splint after four months of therapy. (*Id*. at 52.) The ALJ stated that, in June 2008, Plaintiff had reported that she heard a "pop" in her left knee, but X-ray results were negative, as were the results of a McMurray test. (*Id*.) The ALJ stated that the negative McMurray test indicated that Plaintiff's meniscus was not injured. (*Id*.)[59] The ALJ also noted Plaintiff's diagnosis of plantar fasciitis in her left foot, the X-ray results showing a calcaneal spur in her left foot, and her complaints of ankle and back pain. (*Id*. at 52-53.) Following his description of Plaintiff's conditions and complaints, the ALJ noted different instances, during the same time period, when Plaintiff was found to have been able to "ambulate[] without assistance." (*Id*. at 53.)

Next, the ALJ noted the surgery performed by, and the opinions of, Plaintiff's treating podiatrist, Dr. Quinn. The ALJ stated that Dr. Quinn had performed a partial fasciectomy on Plaintiff's left foot on December 8, 2011, and referenced Dr. Quinn's report that Plaintiff had tolerated the procedure well and had been discharged to the recovery ward in good condition, with instructions to wear a surgical shoe and use crutches. (*Id.*) The ALJ then noted

---

[59] The ALJ did not mention the later positive McMurray sign, from a test performed three months later (*see id*. at 324), although, as noted above (*see supra* at n.14), a subsequent MRI did not, in any event, reveal a meniscus tear (*see id*. at 483).

Dr. Wiener's findings from January 2012 that Plaintiff had a "normal gait"[60] and the findings from other examinations that she used a cane to ambulate.  (*Id*.)

After describing the above medical evidence, the ALJ concluded that the evidence did not "fully support [Plaintiff's] statements concerning her physical impairments, thus diminishing her credibility."  (*Id*.)  In this regard, the ALJ compared certain of Plaintiff's statements to Dr. Quinn's report, noting that Dr. Quinn had not included, in his opinion, any statement that Plaintiff needed to keep her leg elevated (as Plaintiff had testified),[61] and that Dr Quinn had opined that Plaintiff could lift at least some weight (while Plaintiff had testified that she could not engage in any lifting at all).  (*Id.*)

The ALJ then stated that he was only giving "some weight" to Dr. Quinn's opinions as to the effects of Plaintiff's impairments, on the ground that the evidence did not support the stated opinions.  The ALJ noted that Dr. Quinn had opined that, commencing as early as July 2009, Plaintiff could stand for only 15 minutes at one time, and could only stand and walk for less than two hours in an eight-hour work day, while Plaintiff had testified that she could walk up to three hours before her December 2011 surgery and up to 20 minutes post-surgery.  (*Id.*)  The ALJ also stated that he was "decreas[ing] the weight of [Dr. Quinn's] opinion" because Dr. Quinn did not "identify precisely how long" Plaintiff could stand and walk or precisely how much Plaintiff could lift.  (*Id*.)  The ALJ did state that Dr. Quinn's opinion that Plaintiff should avoid work that

---

[60] *See supra* at n.4.

[61] Dr. Quinn did not actually opine that Plaintiff did *not* need to keep her leg elevated. Rather, although the Physical RFC Questionnaire that Dr. Quinn filled out posed the question: "With prolonged sitting, should your patient's leg(s) be elevated" (*id*. at 488), Dr. Quinn omitted any response to this question, either affirmative or negative (*see id*.).

would involve sitting or standing for a prolonged time was consistent with the ALJ's RFC determination.[62]  (*Id.*)

Next, the ALJ found that Plaintiff had a back impairment that "diminished her ability to lift, carry, push, and pull," although he highlighted aspects of the medical record that showed either "little evidence" of the "frequency, duration, and intensity" of Plaintiff's back pain, or inconsistencies in her complaints of such pain.  (*See id.* at 53-54.)  The ALJ also found that "[t]he medication treatment showed that it alleviated [Plaintiff's] back pain."  (*Id.* at 55.)

The ALJ also referenced Plaintiff's work history, which he found "suggested [that Plaintiff] could perform a number of activities despite [her] physical impairments."  (*Id.*)  He noted that Plaintiff had worked from March 2009 to July 2011, four hours per day for three days per week, and stated that the evidence suggested that she could have worked more days per week.  (*Id.*)

Summarizing his analysis, the ALJ concluded that Plaintiff's right fibula fracture and left foot plantar fasciitis, for which Plaintiff had recently undergone surgery, diminished Plaintiff's ability to stand, walk, and sit.  (*Id.*)  The ALJ also concluded that Plaintiff's back problems, when coupled with her foot impairments, limited the amount of weight that Plaintiff could lift.  (*Id.*)  Based on these impairments, the ALJ determined that Plaintiff had physical limitations that

---

[62] The ALJ did not explain, however, how Dr. Quinn's opinion that Plaintiff could only sit for a total of four hours in an eight-hour work day (*see id.* at 488) was consistent with the RFC determination.

restricted her to the performance of sedentary work, but that she had the RFC "to perform the full range of sedentary work," as defined in 20 C.F.R. § 416.967(a).[63]  (*R.* at 50.)

### E.      Step Four

At step four, the ALJ determined that Plaintiff was unable to perform any of her past relevant work.  (*Id.* at 55.)  The ALJ cited Plaintiff's past relevant work as a "cashier II," which, according to the Dictionary of Occupational Titles, requires a "light" exertional level, has a specific vocational preparation ("SVP") level of two, and is considered unskilled work.  (*Id.*)  The ALJ also cited Plaintiff's past relevant work as a "home attendant," which requires a "medium" exertional level, has an SVP level of three, and is considered semiskilled work.  (*Id.*)  As Plaintiff's past relevant work as a cashier II and a home attendant exceeded Plaintiff's RFC, the ALJ found that Plaintiff was unable to perform her past relevant work.  (*Id.* at 56.)

### F.      Step Five

At the final step of the evaluation, the ALJ considered Plaintiff's RFC in conjunction with the Grids.  (*Id.* at 56.)  Taking into account Plaintiff's RFC to perform the full range of

---

[63] According to this Regulation,

> [s]edentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 416.967(a).  In terms of the particular sitting, standing, and walking abilities that are needed for sedentary work, the SSA has explained that such work generally requires no more than about two hours of standing or walking and approximately six hours of sitting in an eight-hour work day.  SSR 83-10; *see also Penfield v. Colvin,* 563 F. App'x 839, 840 n.1 (2d Cir. 2014) (Summary Order); *Rosa v. Callahan*, 168 F.3d at 78 n.3; *Maniscalco v. Colvin*, No. 13cv4359 (KPF), 2015 WL 273689, at *8 n.17 (S.D.N.Y. Jan. 22, 2015).

sedentary work, age of 31,[64] high school level of education, and past relevant work experience performing unskilled work, the ALJ determined that the Grids directed a finding that Plaintiff was "not disabled."  (*Id.* (citing Rule 201.27, 20 C.F.R. Pt. 404, Subpt. P, App. 2).)

## III.   REVIEW OF THE ALJ'S DECISION

As the ALJ used the applicable five-step evaluation in analyzing Plaintiff's claim, the remaining questions for this Court are whether, in evaluating Plaintiff's claim, the ALJ made any errors of law that might have affected the disposition of the case or made any findings that were not supported by substantial evidence.

### A.   The ALJ's Consideration of the Opinion of Plaintiff's Treating Podiatrist

Plaintiff argues that the ALJ failed to apply the treating physician rule correctly, resulting in an erroneous finding that Plaintiff was able to perform the full range of sedentary work. (Pl. Mem., at 15-18.)  Specifically, Plaintiff argues that the ALJ did not consider all of the necessary factors in deciding to accord only "some weight," as opposed to controlling weight, to the opinion of Plaintiff's treating podiatrist, Dr. Quinn.  (*Id.* at 17.)  Relatedly, Plaintiff asserts that, with respect to assessing the limitations imposed by Plaintiff's physical impairments, the ALJ committed legal error by according greater weight to the consulting opinion of Dr. Mescon than to the opinion of Dr. Quinn.  (*See* Pl. Reply Mem., at 6.)  Defendant, in contrast, argues that the ALJ "offered numerous good reasons" why Dr. Quinn's opinion was entitled to only some evidentiary weight, and that the ALJ "reasonably concluded that [P]laintiff's foot condition

---

[64] The ALJ noted that, at the time she filed her application, Plaintiff was 31 years old, and was thus categorized by the Grids as a "younger individual age 18-44."  (*Id.* at 56.)  The ALJ then stated that Plaintiff subsequently moved into another age category – that of "a younger individual age 45-49."  (*Id.*)  As Plaintiff was born on November 9, 1978 and was 33 at the time of the hearing, it appears that the ALJ referenced the 45-49 age category in error.  Any such error, however, was immaterial to his decision, as, in his application of the Grids, he cited and apparently applied the Rule that correctly corresponded to Plaintiff's actual age.  (*See id.* (citing Rule 201.27, 20 C.F.R. Pt. 404, Subpt. P, App. 2).)

would limit her to sedentary work, but would not preclude all work activity." (Def. Mem., at 22.)

The parties do not dispute that, with respect to impairments of the foot and ankle, a podiatrist, such as Dr. Quinn, is considered an acceptable medical source, *see* 20 C.F.R. § 416.913(a)(4), whose opinion is entitled to special consideration in accordance with the factors set forth in 20 C.F.R. § 416.927(c). Therefore, to the extent Dr. Quinn offered an opinion as to the nature and severity of any physical limitations arising out of Plaintiff's plantar fasciitis in her left foot and the surgery she had undergone for that condition, his opinion was required to be weighed in accordance with the treating physician rule. Furthermore, if the ALJ committed error in discounting the weight that he accorded to Dr. Quinn's opinion, then such error would have been material in this case, as Dr. Quinn's opinion that Plaintiff could not sit for more than four hours in the course of a work day (R. at 488) would, if accepted, have precluded a finding that Plaintiff could engage in the full range of sedentary work. (*See supra* at n.63 (explaining that sedentary work generally requires a worker to sit for up to six hours in an eight-hour work day).) Similarly, Dr. Quinn's opinion that Plaintiff could only stand and walk for less than two hours, and could only "rarely" lift or carry weights of less than 10 pounds (*see* R. at 488) would have been inconsistent with the ALJ's determination of Plaintiff's RFC (*see supra* at n.63).

The ALJ stated that he only gave "some weight" to Dr. Quinn's opinion because "the evidence did not support his opinion." (R. at 53.) A close review of the ALJ's decision, however, calls this explanation into question. First, it appears that the ALJ used circular reasoning in determining that Dr. Quinn's findings were not supported by Plaintiff's own testimony; in this regard, the ALJ used Dr. Quinn's report to find that, where Plaintiff contradicted his findings, her credibility was diminished (*see id*. at 53), and then immediately

used Plaintiff's testimony to find that, where Dr. Quinn's report contradicted her statements, the doctor's opinion was entitled to reduced weight (*see id.*).  It cannot be that, whenever a claimant's testimony fails to align entirely with a treating doctor's report, the statements of each will render those of the other unreliable.

Second, to the extent the ALJ "decreas[ed] the weight" of Dr. Quinn's opinion because he "did not identify precisely how long [Plaintiff] could . . . stand and walk" (*id.*), this cannot, on the actual record presented, be accepted as a "good reason" for failing to give Dr. Quinn's opinion controlling weight, *see* 20 C.F.R. § 416.927(c)(2), *see also Snell,* 177 F.3d at 133 (noting the need for an ALJ to provide "good reasons for not crediting the opinion of a claimant's treating physician").  As to this point, Dr. Quinn filled out the relevant portions of the SSA's own form questionnaire in the precise manner provided by the form, which asked whether Plaintiff could "stand/walk" for "less than 2 hours," "about 2 hours," "about four hours" or "at least six hours" in an eight-hour working day, with normal breaks.  (*See* R. at 488.)  As to this particular question, Dr. Quinn checked the line indicating that Plaintiff could stand and/or walk for "less than 2 hours."  (*Id.*)  Dr. Quinn also specifically indicated, by circling his answers on the form, that Plaintiff could stand for 15 minutes at one time, before needing to sit or walk (*id.* at 487), and that, during an eight-hour work day, she would need to walk approximately every 60 minutes, for five minutes at a time (*id.* at 488).  In light of these responses, and the fact that Dr. Quinn's opinion as to how long Plaintiff could sit (about 4 hours) (*id.*) would have, in any event, placed her below the threshold for sedentary work, it is difficult to discern any

justification for the ALJ's assertion that Dr. Quinn's supposed "imprecision" as to how long she could stand or walk warranted a decrease in the weight to be assigned to his opinion.[65]

Third, to the extent that the ALJ found Dr. Quinn's opinion to be inconsistent with Dr. Wiener's recorded notation, made a month after Plaintiff's foot surgery, that Plaintiff had a "normal gait" (*see id*. at 53; *see also supra* at n.4), it is difficult to see how Dr. Wiener's observation could possibly have outweighed Dr. Quinn's opinions regarding Plaintiff's limitations in her ability to sit, stand, and walk for extended periods.  Dr. Wiener, an Emergency Room physician, was not a podiatrist or orthopedist, did not have a treatment history with Plaintiff, and, on the date of the observation in question, was evaluating Plaintiff for her complaint of *headaches* (*see* R. at 444) – not for anything having to do with her foot pain or any functional limitations in extended sitting, standing, or walking that may have resulted from such pain.

In any event, even if the ALJ had a proper basis for determining that Dr. Quinn's opinion was inconsistent with the medical evidence in the Record, and was therefore not entitled to "controlling" weight, the ALJ was still required to apply the factors listed in 20 C.F.R. § 416.927(c) to determine the degree of weight to accord to this treating source's opinion.  *See* Social Security Ruling 96-2P (S.S.A. July 2, 1996) (stating that a finding of inconsistency "means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be

---

[65] Additionally, as the ALJ had a duty to resolve any ambiguities in the Record, any suggestion that it was proper for him to decrease the weight of Dr. Quinn's opinion because it was imprecise is untenable.  If the ALJ believed that more specific information was needed than what was called for by the SSA questionnaire itself, then he should have requested that Dr. Quinn provide the necessary specificity.  *See Ocasio v. Barnhart*, No. 00cv6277 (SJ), 2002 WL 485691, at *8 (E.D.N.Y. Mar. 28, 2002) ("If the reports of treating physicians are insufficient or inconsistent, the ALJ may not simply dismiss them. Rather, he has an affirmative duty to develop the administrative record, including seeking additional information from the treating physicians." (citing *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (additional citations omitted))).

rejected," and that the opinion "is still entitled to deference and must be weighed using all of the factors" in the applicable regulations).  These factors include not only consistency, but also the length of the doctor's treating relationship with the claimant, the nature and extent of the relationship, the supportability of the doctor's opinion, and the nature of the doctor's specialization.  20 C.F.R. § 416.927(c).  Here, the ALJ's decision does not reflect that he evaluated these factors in reaching his conclusion that Dr. Quinn's opinion was only entitled to "some" weight and that it was appropriate to reject those aspects of the opinion that would have dictated that Plaintiff could not, in fact, perform the full range of sedentary work.

Accordingly, this case should be remanded, with instructions to the ALJ to reevaulate Dr. Quinn's opinion in accordance with the treating physician rule.  If, after consideration of all of the relevant factors, the ALJ were still to determine, upon remand, that Dr. Quinn's opinion as to Plaintiff's restrictions in her abilities to sit, stand, walk, lift, and carry is not entitled to controlling weight, then the ALJ should set out good reasons for the weight that should be assigned.

## B.     The ALJ's Reliance on the Medical Vocational Guidelines

Plaintiff also argues that the ALJ committed legal error at step five of the sequential analysis by relying on the Grids, rather than calling a vocational expert to assist in evaluating whether Plaintiff was capable of performing work in the national economy.  (Pl. Mem., at 20-21.)  In opposition, Defendant argues that the medical evidence in the Record "[did] not suggest that [P]laintiff was incapable of performing the basic mental demands of unskilled work," and, that the ALJ therefore appropriately determined that Plaintiff's non-exertional limitations "were not at issue and would not have precluded reliance on the [G]rids." (Def. Mem. at 25.)

The central issue in determining if the ALJ erred in relying solely on the Grids at step five is whether Plaintiff's mental impairment caused non-exertional limitations that "significantly limit[ed] the range of work permitted by [her] exertional limitations." *Zabala v. Astrue*, 595 F.3d 402, 410 (2d. Cir. 2010) (quoting *Bapp v. Bowen,* 802 F.2d 601, 605 (2d Cir. 1986). A non-exertional impairment will "significantly limit" a claimant's range of work "when it causes an additional loss of work capacity beyond a negligible one, or, in other words, one that so narrows a claimant's possible range of work as to deprive [her] of a meaningful employment opportunity." *Woodmancy v. Colvin*, 577 Fed. App'x 72, 75-76 (2d Cir. 2014) (Summary Order) (quoting *Zabala*, 595 F.3d at 411). "If, however, a claimant does not have such limitations, the ALJ may rely on the [Grids] to adjudicate the claim." *Id.* This Court notes that the "ALJ's analysis at step five is dependent on his RFC assessment," and where the "RFC assessment is flawed and must be revisited on remand . . . [the ALJ's] analysis at step five will likely require review on remand as well." *Munoz v. Colvin*, No. 13cv1269 (VSB) (HBP), 2014 WL 4449788, at *17 (S.D.N.Y. Sept. 10, 2014).

Here, back at the second step of the five-step sequential evaluation process (where the ALJ needed to determine whether Plaintiff had any "severe" impairments), the ALJ found that Plaintiff had the medically determinable mental impairment of adjustment disorder and depression, but that this impairment should not be considered severe because it "[did] not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities." (R. at 46.) While this finding may appear analogous to a step-five finding that Plaintiff did not have any non-exertional limitations that "significantly limit[ed] the range of work permitted by her exertional limitations," *Zabala,* 595 F.3d at 410-11, the analyses at step two and step five are necessarily distinct. Indeed, the ALJ himself noted that the analysis at step two, which considers

the general extent of a plaintiff's mental limitations in each of four domains of functioning, is not intended to substitute for a more specific RFC determination (*see id*. at 50).  Rather, as the ALJ recognized, "the mental [RFC] assessment used at steps [four] and [five] of the sequential process requires *a more detailed assessment* by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders in 12.00 of the Listing of Impairments."  (*Id*. (citing SSR 96-8p (S.S.A. July 2, 1996)) (emphasis added).)  Nonetheless, the ALJ did not go on to perform the type of "detailed assessment" of Plaintiff's mental functional abilities, in connection with his determination of her RFC, that he acknowledged was required.[66]  In fact, the ALJ never even mentioned Plaintiff's mental impairment in connection with his RFC evaluation, or in his discussion, at step five, of the type of work that Plaintiff would be able to perform.  This was legal error.

Moreover, regardless of the ALJ's step-two finding of non-severity, the Record is insufficient for the Court to determine whether Plaintiff actually had any mental limitations that should have been factored into her RFC and potentially precluded the ALJ's use of the Grids in making his ultimate disability determination.  In fact, there was evidence missing from the Record that should have been developed by the ALJ, even in connection with his step-two analysis regarding the severity of Plaintiff's mental impairment.  Most significantly, while Plaintiff had received mental health treatment for nearly a year at Harlem Hospital, making at least 13 visits to physicians at a clinic there (including treating doctors Singh, Jolayemi, Rahman,

---

[66] For example, even if, as a whole, the consulting report of Dr. Fujiwaki may have supported a finding that Plaintiff's mental impairment was non-severe, this would not have excused the ALJ from proceeding, at steps four and five, to consider whether Dr. Fujiwaki's opinion that Plaintiff might "have some difficulty relating with others and dealing with stress appropriately" (*see id.* at 255, *see also id*. at 47) suggested a limitation that would have affected her ability to perform the full range of sedentary work.  *See e.g.*, *Munoz*, 2014 WL 4449788, at *16-17.

Shah, and Calicdan (*see* R. at 296, 299, 301, 305, 307, 308, 310, 314, 316, 319, 352, 353, 392)),

and at least eight additional visits to an anger management group (where she received psychiatric

diagnoses from Dr. Whitmarsh (*see id.* at 297-98, 303-04, 358, 365, 371-72, 384, 386, 389)), the

record contained no medical source statement from any of these doctors.  This suggests that the

ALJ never reached out to anyone at Harlem Hospital – from either the outpatient clinic or the

anger management group – to request the completion of an SSA questionnaire regarding the

extent of any mental functional limitations that Plaintiff may have exhibited, even though the

pertinent Regulations require an ALJ to "request a medical source statement about what [the

claimant] can still do despite [his or her] impairment(s)."  20 C.F.R. § 416.913(b)(6).

Although the Regulations also provide that the mere lack of a medical source statement

"will not make [a medical] report incomplete," *id.*; *see also Tankisi v. Comm'r of Soc. Sec*., 521

Fed. App'x 29, 33-34 (2d Cir. 2013) (noting that, in certain cases, it would be "inappropriate to

remand solely on the ground that the ALJ failed to request medical opinions in assessing

[RFC]"), the Court is faced, here, with a situation in which the ALJ highlighted – and effectively

penalized Plaintiff for – the fact that Plaintiff's mental-health treatment records were incomplete

in various ways.  Even with respect to Plaintiff's initial mental-health treatment at St. Luke's-

Roosevelt, the ALJ expressly stated that the fact that "[*t*]*here was very little evidence* in

treatment from August 2010 [when Plaintiff first raised mental health issues, at St. Luke's] to

June 2011 [when she was in later treatment at Harlem Hospital]" *itself* "suggest[ed] that the

conditions did not impose limitations."  (R. at 48 (emphasis added).)  It was inappropriate to

draw such an inference, without first seeking to fill in any gaps in the medical record.  *See*

20 C.F.R. § 416.912(d).  Given that (a) the treatment notes from Plaintiff's August 2010 visit at

St. Luke's reflect an anticipated a follow-up visit in two weeks and monthly visits thereafter (*see*

R. at 239), and (b) Plaintiff testified that she continued to receive treatment at Roosevelt for two or three months after her initial visit (*id*. at 78-79), the ALJ should have sought to determine if additional treatment evidence existed for that early period, *see* 20 C.F.R. § 416.912(d). Certainly, without doing so, the ALJ should not have allowed the absence of evidence to influence his decision regarding the severity of Plaintiff's impairment during the time period in question, or regarding the related question of the scope of Plaintiff's mental RFC.

As to Harlem Hospital, Plaintiff's first recorded visit to a mental-health provider there was actually in March 2011 (*see* R. at 352), and she continued to make regular visits to Harlem Hospital for mental-health treatment until at least February 2012 (*id*. at 319). The progress notes in the Record, however, are silent as to whether Plaintiff's diagnosed conditions and symptoms translated into functional limitations. At most, in this regard, the Record contains short letters from Drs. Jolayemi, Shah, and Singh, written in June, August, and September 2011, respectively, stating that Plaintiff should "limit her environmental stressors and demands" (*see id*. at 295, 296, 350), and, in the case of the letters from Drs. Singh and Shah, also stating that Plaintiff was "exhibiting decreased interest, poor concentration, and low energy" (*id*. at 296, 350). It does not appear that any of these doctors were ever asked to explain or provide a more particularized explanation of these limitations, in order to aid the ALJ in determining whether Plaintiff lacked, for example, "the abilities to (1) understand, carry out, and remember simple instructions, (2) respond appropriately to supervision, coworkers, and usual work situations[,] and (3) deal with changes in a routine work setting." *Munoz*, 2014 WL 4449788, at *16 (noting that "the loss of any of [these abilities] would severely limit the number of jobs the claimant could obtain" (citing SSR 85-15)).

Instead of seeking more information from Plaintiff's treaters as to the extent of her mental limitations, the ALJ quickly discounted any opinion expressed by any of the Harlem Hospital physicians – at least in part *because* they did not include enough information.  The ALJ gave "little weight" to the opinions expressed in Dr. Jolayemi's letter on the ground that "the letter did not identify any factors" (R. at 48) and was unaccompanied by treatment records (*see id*. ("the letter did not have progress notes to support this opinion")).  The ALJ similarly gave "little weight"to the opinion purportedly given by Dr. Calicdan that Plaintiff "was unable to work for the next six months,"[67] on the ground that "[t]he physician did not identify the limitations that [Plaintiff] had that would explain this inability to work, [and] . . . did not mention restrictions in activities of daily living, social interaction, of concentration, persistence and pace."  (*Id*. at 49)  The ALJ also gave "little weight" to Dr. Singh's opinion, on the sole ground that it appeared to rely too heavily on Plaintiff's self-report of her symptoms and limitations (*id*. at 49), suggesting that, in the ALJ's view, Dr. Singh had failed to provide sufficient objective evidence to support her stated clinical findings.  The ALJ never even mentioned the letter written by Dr. Shah, which contained the same findings as the one written by Dr. Singh.  (*Compare id*. at 296 *with id*. at 350.)

While the Record, in this case, does include progress notes from the several Harlem Hospital psychiatrists who treated Plaintiff over an extended period of time (*see, e.g*., *id*. at 299, 301, 305, 307, 308, 310), those progress notes, standing alone, cannot be said to be sufficiently comprehensive to have rendered immaterial the ALJ's apparent failure to seek medical source statements from any of these doctors.  Rather, the progress notes are typically short and often vague, failing to provide a clear description of Plaintiff's limitations in the relevant functional

---

[67] *See supra* at n.57.

domains, as would be necessary to "permit an outside reviewer to thoughtfully consider the

extent and nature of [Plaintiff's] mental-health conditions and their impact on her RFC."

*Sanchez v. Colvin*, No. 13cv6303 (PAE), 2015 WL 736102, at *8 (S.D.N.Y. Feb. 20, 2015)

(finding administrative record insufficient to overcome an ALJ's failure to request opinions from

the plaintiff's treating psychiatrist as to mental impairments, where, *inter alia*, the notes by the

treating psychiatrists were vague and not detailed); *see also Tankisi*, 521 Fed. App'x at 33-34

(noting that absence of medical source statements need not require remand, where the "record

contains sufficient evidence from which an ALJ can assess the petitioner's [RFC]," such as an

assessment of the claimant's limitations by a different treating physician and a "voluminous

medical record"); *Swiantek*, 588 Fed. App'x at 84 (holding remand not required solely on the

basis of the absence of a medical source statement from the claimant's treating physician due to

the "extensive medical record" and the fact that there were no "obvious gaps" in the record).

Certainly, the treatment notes here, absent clarifying information from the treaters, provided an

insufficient basis for the ALJ to weigh the opinion of a consultant psychiatrist much more

heavily than the opinions of any and all of Plaintiff's own doctors.

Indeed, the ALJ failed to adhere to the treating physician rule, when he discounted the

opinions of all of Plaintiff's treating psychiatrists, far below that of consultant Dr. Fujiwaki,

without first discussing the factors that should have been considered in determining the weight to

assign to the treaters' opinions.  (*See* Discussion *supra* at Section I(D).)  Although the ALJ may

have suggested, explicitly or implicitly, that any such opinions were not entitled to controlling

weight because they were not well-supported by the medical treatment records or were

inconsistent with other evidence, such reasoning cannot be deemed sufficient where the medical

record itself has not been well developed.  If the ALJ "perceive[d] inconsistencies" in the reports

of Plaintiff's treaters, then he bore "an affirmative duty to seek out more information from the treating physician[s] and to develop the administrative record accordingly." *Hartnett v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998) (citing *Clark v. Comm'r of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir.1998)).  Moreover, even if inconsistent with other substantial evidence, a treating physician's opinion is still generally entitled to "more weight" than the opinions of non-treating and non-examining sources.  20 C.F.R. §§ 416.927(c)(1), (2); *see Gonzalez v. Apfel*, 113 F. Supp. 2d 580, 589 (S.D.N.Y. 2000).

   All of this provides another basis for remand, here with instructions that the ALJ take steps to develop the Record by filling in any gaps caused by the lack of psychiatric treatment notes for any periods where the ALJ may have found them missing; by seeking clarification from Plaintiff's psychiatric treaters at Harlem Hospital regarding any treatment notes that are vague or incomplete with respect to her mental limitations; and by seeking medical source statements from treaters at both the Harlem Hospital clinic and anger management group, with regard to Plaintiff's mental RFC.  Further, I recommend that, both in connection with his step-two analysis of the severity of Plaintiff's medically determinable mental impairment, and in connection with his later RFC evaluation and its use at step five, the ALJ be directed to consider any additional evidence obtained and to apply the treating physician rule in accordance with 20 C.F.R. § 416.927(c)(2).  Finally, I recommend that, in connection with his RFC analysis and at step five, the ALJ be instructed to perform the detailed analysis of Plaintiff's mental limitations that is required by SSR 96-8p, and, in light of that analysis, to revisit the question of whether the testimony of a vocational expert is required, or whether it is appropriate simply to rely on the Grids in this case.

C.    __Additional Arguments Raised by the Parties__

Plaintiff has raised certain additional arguments here – specifically regarding the ALJ's assessment of Plaintiff's credibility and his alleged failure to consider the combined effect of all the Plaintiff's medical conditions (*see* Pl. Mem., at 18-21) – that the Court need not reach at this juncture, given that the ALJ's analysis on these points may change upon remand.

This Court recommends, however, that, on remand, the ALJ be reminded to apply Section 416.929 of the regulations and Social Security Ruling 96-7p, in evaluating Plaintiff's credibility.  As the ALJ appeared to base his previous credibility determination, at least in part, on the *lack* of certain medical evidence, the ALJ should re-evaluate Plaintiff's credibility after having made further efforts to develop the Record.  He should also give explicit consideration to all factors that are relevant to a credibility determination.  *See* 20 C.F.R. § 416.929(c)(3)(i)-(vii) (listing a number of factors the ALJ must evaluate in determining Plaintiff's credibility regarding her specific symptoms, including, *inter alia*, the "the location, duration, frequency, and intensity of the pain," "precipitating and aggravating factors," and "the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain"); *see also See Montes–Ruiz v. Chater,* 129 F.3d 114, *2 (2d Cir. 1997) ("A proper consideration of credibility should have involved considering factors such as evidence of a good work record, which this Court views as entitling a claimant to 'substantial credibility."); *Cahill v. Colvin,*  No. 12cv9445 (PAE) (MHD), 2014 WL 7392895, at *26 (S.D.N.Y. Dec. 29, 2014) ("The Second Circuit has held that the ALJ must consider prior work record records because they are probative of credibility." (citing *Schaal,* 134 F.3d at 502)).

This Court also recommends that the ALJ be reminded that even if he determines that certain of Plaintiff's impairments are not severe, he then "must consider the combined effect of

all of [Plaintiff's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity."  20 C.F.R. § 416.923; *see e.g., Lang ex rel. Morgan v. Astrue*, No. 05cv7263 (KMK) (PED), 2009 WL 3747169, at *6 (S.D.N.Y. Nov. 6, 2009) (remanding where the ALJ "made no specific findings as to whether and to what extent the effect of the combined impairments caused [the claimant] to be disabled"); *Dixon v. Sullivan,* 792 F. Supp. 942, 956 (S.D.N.Y.1992) (stating that "[t]he Second Circuit has long required that the combined effect of all of a claimant's impairments . . . be considered in determining disability and has repeatedly ruled that the Act requires SSA to evaluate the combined impact on a claimant's ability to work of every impairment, regardless of whether each [alone] is considered severe" (citing *DeLoen v. Sec'y of HHS,* 734 F.2d 930, 937 (2d Cir. 1984))).

Finally, this Court notes that Defendant's brief is largely focused on arguing that the ALJ's decision is supported by substantial evidence in the Record.  (*See generally* Def. Mem.) Where, however, remand is appropriate because the ALJ failed to apply the correct legal principles, the Court should not, prior to remand, attempt to assess whether substantial evidence in the Record supports the ultimate disability determination.  *See, e.g.*, *Meadors*, 370 Fed. App'x at 184 ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." (quoting *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987))).  Accordingly, at this point in time, the Court should not attempt to make this assessment.

## **CONCLUSION**

For the foregoing reasons, I respectfully recommend that:

(1)    Plaintiff's motion for judgment on the pleadings (Dkt. 23) be granted to the extent that the case be remanded, pursuant to sentence four of 42 U.S.C. § 405(g), for development of the Record and reconsideration of the issues discussed above, and

(2)    Defendant's cross-motion for judgment on the pleadings (Dkt. 28) be denied.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  *See also* Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Gregory H. Woods, United States Courthouse, 500 Pearl Street, Room 2260, New York, NY 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, NY 10007.  Any requests for an extension of time for filing objections should be directed to Judge Woods.  FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.  *See Thomas v. Arn,* 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*,

968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988);

*McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:  New York, New York
        March 9, 2015

Respectfully submitted,

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

Hon. Gregory H. Woods, U.S.D.J.

All counsel (via ECF)